*Spencer, Ch. J.
The principles which must govern this case are, in my apprehension, very plain and simple. The appellants seek to have a policy of insurance amended, after a loss has happened, on the ground of a mistake in the policy in several particulars, but principally in this, that the brig insured by the respondents, is described in the policy as the “ good American brig, called the Union,” when, as it is alleged, it was the intention of the appellants, and must have been so understood by the respondents, that her national character should be Portuguese.
Before I examine the facts, I will briefly advert to what I consider to be the law as applicable to this case. It cannot be necessary to refer to cases in support of this proposition: that before a written contract can be amended or altered, on the pretence of mistake, the proof must be entirely clear, first, that a mistake, has occurred; and, secondly, that the amendment sought would conform the contract to the intention of both parties. The proof of the mistake must be clear and decisive, for the written contract executed by the one party, and accepted by the other, affords very high evidence, that it speaks the agreement and intention of the parties. Parol communications leading to a contract, consisting of propositions and answers, must necessarily be vague and uncertain ; and we are to look for the real contract, in the solemn and consummated act of the parties, the final and written agreement between them. I admit that, notwithstanding the agreement is testified bv a written contract, yet if it can be shown to the entire con *297 viction of a court, that fraud or mistake has intervened, and the written agreement is variant from the actual contract, in either of these cases, it is competent to a court of equity to amend the agreement in writing, conformably to the clear and manifest intention of the parties. And, upon this point, I adopt the opinion delivered by the chancellor, in Gillespie and Wife v. Moon, (2 Johns. Ch. Rep. 585.) that a party may be admitted to show, by parol proof, a mistake, as well as fraud, in the execution of a deed or other writing. In most cases, it will be almost impossible to overthrow the deed by proof aliutule, that there is a mistake; but where the proof does establish the *fact of mistake, a court of equity will reform and correct the contract. The reasoning and the authorities cited in the case of Gillespie and Wife v. Moon, present the point, and establish the position laid down by the chancellor, in a manner calculated to command entire assent; and that case, I will venture to say, will remain as a landmark for future decisions; the reasoning is strong, irresistible, and conclusive. «
It is not enough, in cases of this kind, to show the sense and intention of one of the parties to the contract; it must be shown, incontrovertibly, that the sense and intention of the other party concurred in it; in other words, it must be proved, that they both understood the contract, as it is alleged it ought to have been, and as in fact it was, but for the mistake. It would be the height of injustice to alter a contract, on the ground of mistake, where the mistake arises from misconception by one of the parties, in consequence of his imperfect explanation of his intentions. To make a contract, it is requisite that the minds of the contracting parties agree on the act to be done; if one party agrees to a contract under particular modifications, and the other party agrees to it under different modifications, it is evident there is no contract between them. If it be clearly shown, that the intention of one of the parties is mistaken and misrepresented by the written contract, that cannot avail, unless it further be shown, that the other party agreed to it in the same way, and that the intention of both of them was, by mistake, misrepresented by the written contract. There may be cases in which the mistake is rendered so palpable, that the denial of it by one party would not be entitled to credit. The question would be, how it ought to have been understood, and how the court believe it must have been understood.
I confess, that I am strongly impressed with the belief, that when the appellants applied to the respondents for insurance, they intended, by the representation, that “the said brig will sail under a Portuguese royal passport,” that her national character was to be Portuguese. But I am as strongly persuaded, that the respondents did not understand the representation in that way, but, on the contrary, that *they believed *298 she was to be documented as an American ship, carry ins a Portuguese passport, as an innocent disguise of her real American character: and that, consequently, the appellants have failed in making out the fact, that there was a mutual mistake in the policy.
It is to be observed, that the parties never held any communication, excepting by writing, preparatory to the contract of insurance. The appellants made their written application, through the secretary of the company, and the answer was given in. short memoranda at the foot of the application. The respondents, in their answer, assert, that they understood, and did believe, at the time the appellants’ written application lor insurance was under consideration, and when the terms and conditions of insurance were settled and agreed upon, that the appellants, who were American citizens, were the owners of the brig, or were interested in her ; that she was an American vessel, and duly documented as such, and was so to continue during her intended voyage; and they further state, that they did not know, nor were they informed, nor did they suppose, that the Portuguese royal passport, mentioned in the written application, was a certificate, or document, constituting or evidencing the national character of the vessel, or that the use thereof, by the brig, was inconsistent with her character or obligations as an American vessel. The policy of insurance is very high evidence, that the respondents really entered into the contract of insurance in conformity with their understanding of the representation, as set forth in their answer.
I perceive nothing in the evidence which disproves the facts set up in the answer, confirmed as they are by the policy itself. Before going into the evidence, let us attend to the history of this transaction. After the respondents had given their answer to the appellants’ application, the secretary of the board communicated it to the appellants, who acceded to the terms proposed by the respondents, and thereupon, and within two or three days, a policy was made out in legal form, and delivered to the appellants.
The policy, had the appellants looked at it. would have shown them the contract into which the respondents had ♦entered. And it certainly is a very lame excuse, that they did not read it before they gave their notes to secure the payment of the premium. It appears, however, that after the vessel actually sailed, and about ten days after the signing of the policy, one of the appellants represented to the president and assistant of the company, that the brig had the protection of Portuguese papers, and asked the president whether or not the company considered themselves on the risk; to which the president answered, that the vessel being insured as an American, the circumstance of having Portuguese papers might prejudice the insurance. The appellant, J. Lyman, expressed a wish to have the policy so altered as to permit the brig to sail with *299 Portuguese papers, and, as the president understood, to use the Portuguese flag; which proposition was declined. The answer states, that the appellants, subsequently, applied to know what additional premium would be asked, under the then information, to insure the brig as sailing with Portuguese papers, and that an additional premium of five per cent, was demanded.
I mention these facts, to show that the appellants had early information of the true state of the policy, that they treated in relation to its alteration, and that the respondents, before any event had happened to induce them to take the ground they now do, and from the earliest period, considered the insurance as an American vessel.
Does the memorandum at the foot of the application for a policy, or the parol evidence in the case, show that the respondents understood the contract otherwise ? I must say that they do not.
I concur in the opinion of the chancellor, that this note is far too vague and uncertain to justify any correction of the policy. It would not be intelligible to any person, but the officers of the company ; and in the essential point, whether the vessel was to be insured as an American ship, it is altogether silent; yet the application, with the note at the foot of it, might well have induced the respondents to apprehend that they were asked to insure an American vessel. The appellants were known to be American citizens, and wére believed to be the owners of the brig, or interested in *her ; she was known to the respondents to be an American vessel, and the note represented her to have lately belonged to James Robinson, an American citizen. These facts were calculated to induce the belief that she was to be insured as such ; and the expression in the application, that “ the said brig will sail under a Portuguese royal passport,” might be well understood, either that she would be documented as a Portuguese vessel, or that she would sail under the American character, and carry’ the Portu-gime passport, as a cover; for it is a notorious fact, that it is not only an innocent, but usual device, to carry papers calculated to deceive one of the belligerents, and insure greater security to the vessel using the cover. At all events, we are not authorized to say, that the respondents did understand the terms of the insurance in the way the appellants probably un-derstoqd them ; the policy itself—the uncertainty of the expression in the application—and the striking fact, that the respondents, within a few days after the policy was subscribed, and before the happening of any occurrence to vary the risk, adhered to the assertion, that they had so understood it, and demanded an additional five per cent to alter the policy, so as to adapt it to the appellants’ conceptions, are convincing proofs that the respondents never understood that the vessel was to be documented as a Portuguese vessel.
*300 The appellants’ counsel seemed to place great reliance on the case of Motteux and others v. The Governor and Company of London Assurance and others. (1 Atk. 544. ) The point determined was, that if a policy of assurance differed from the label, it shall be made agreeable to the label. The counsel, to take the benefit of this case, must show that the note at the foot of the application, is of the nature of the label by which the policy was amended in that case. The label there was precise in its terms, and Lord Hardwicke considered it as a memorandum of the agreement in which the material parts of the policy were inserted, the master’s and the ship’s name, the premium, and the voyage ; and it contained the words, “ at and from,” and in that particular the policy, by mistake, differed from the label. It moreover appeared that this label, thus definite in the material *point, was entered in the books of the company, and signed by the owner of the ship insured, and two of the directors. There is no analogy between this case and that; there the agreement was full, definite, and certain: and here, in the very point in dispute, the note is loose, vague, uncertain, and susceptible of being differently understood by different men.
Let us briefly look to the parol evidence. Mr. Morton, the secretary to the Phoenix Insurance Company, in New-York, understood an application made by the appellants for insurance at that office, in terms similar to the one made at the respondents’ office, thus: that the vessel therein intended to be insured was an American vessel, but to sail under a Portuguese character, and so the Phoenix Insurance Company understood it; but he admits that the appellants had fully explained themselves to him; and in his understanding, when it was intended to insure an American vessel, as a vessel to sail under a neutral or foreign character, it was not customary to give any national character to the vessel, but merely to state her name ; and this kind of insurance was general at that time in New- York. Mr. Thompson states, that he always considered a Portuguese royal passport as a complete register.
These opinions, although respectable, by no means decide, that the respondents understood the proposition made by the appellants in the same way; and, independently of the facts already mentioned, to show that, they did not, there is another very strong fact. The Phoenix Company demanded 15 per cent, free of British capture, and seven and a half per cent, if the risk ended at Oporto, whilst, as I understand it, for very nearly the same risk, tire respondents demanded only five per cent, that is, from New- York to Oporto, with the insertion of clause No. 2., which was a warranty against British and American capture and detention ; the warranty against American cápture was immaterial, because the United States were at peace with Portugal. If, then, the rate of premium is uniform, or nearly *301 so, in these offices, the Phcenix Company and the respondents had very different conceptions of the risk to be assured.
I will only add, that the testimony of Walter T. Jones, *who was clerk of the company at the time of the insurance, strongly confirms the respondents’ answer; he states, that he understood the brig to be an American vessel, and intended to have been insured as such; and he believes the president and assistant of the company so understood it; and that it was the uniform practice of the respondents to describe the vessels they insured by their national character, or to insert their national character in the policy, unless it was otherwise specially agreed between them and the insured. That the policy' was filled up correctly, and according to the terms upon which the company offered to insure her, as the same were understood by him, and he believes by the company. That shortly after this insurance, several applications were made, in the course of which it appeared that the paper, called a Portuguese royal passport, was a document intended to represent the said brig as a Portuguese vessel, which (he says) was the first knowledge or suspicion he had, that such was the nature or character of the said document. I have not professed to give all the evidence in the case, for it leads to no safe conclusion. If there were many more witnesses than there are, who would testify, that by a Portuguese royal passport, a Portuguese register was intended, the question recurs, How did the respondents understand the proposition ? I must say, that I consider it a mutual misconception of a fact; and it is impossible to amend a contract on the ground of mistake, so as to make the one party bound by it, when he never assented to that part, in which the alleged mistake consisted. If a party will speak equivocally, and will not look to the agreement itself, to find out how the other party understood him, he cannot complain.
For these reasons, in my judgment, the decree of the Court of Chancery ought to be affirmed.
Platt, J.
I see no ground to impute fraud to either of the parties.
The written application on the one part, and the proposition of the company on the other part, are both somewhat ambiguous ; and the probable solution is, that, for want of explanations on both sides, there has bpen mutual misapprehension %nd mistake. If so, then equity will vacate and annul the contract, but will not make a new bargain, by imposing terms on which the minds of the parties never met.
The bill is not framed for relief, by vacating the contract, so ns to compel the respondents to return the premium merely. The sole object of the bill is, to alter the terms of the policy, so as to enable the assured to recover, in their action at law, as for a total loss, under the contract of insurance.
It is clear, from all the authorities on this head of equit.v, *302 that a written contract cannot be corrected or amended, unless the mistake be proved in the most certain and positive manner; that is, that the parties mutually agreed upon and intended one thing, and, by accident or mistake, the written agreement is made to express another and a different thing. But where, as jn ⅛⅛ cas6; one party intended to cover the risk of the vessel els Portuguese, and the other intended to insure it as American, it is very evident, that, unless the written policy is to be taken as the contract, there was no agreement between the parties. It was optional with the assured to affirm the contract as expressed in the policy, after they received it, or to have rejected it, and recovered back the premium, on the ground of mutual mistake or misunderstanding, as to the propositions for insurance. Whether the subsequent conduct of the appellants has been such as to preclude them from recovering back the premium, even if the policy was founded in mutual mistake, Is a question not now before us.
March 31st.
There is no evidence of any agreement between these parties, different from that expressed in the policy ; on the contrary, the allegations in'the bill, on that point,, are fully and expressly denied in the answers; and those denials are strongly fortified by the testimony of the only witness who was present at the negotiation.
My opinion, therefore, is, that the decree of his honor the chancellor ought to be affirmed.
The majority of the court (a) being of the same opinion, it was thereupon orbehed, adjudged, and deckeed, that *the decree of the Court of Chancery be affirmed, and that the appellants pay to the respondents their costs in defending this appeal, and that the record be remitted, &c.
Judgment of affirmance.

 For affirming, 23; for reversing, 4.