JOSIAH D. NEVIUS and PETER NEVIUS, Executors, &c., of Jane Nevius, deceased, *v.* JOHN DUNLAP, Executor of David Dunlap, deceased.

Where the consideration of a bond proceeds from a third party, who is acting in the name, and for the benefit of the obligee thereof, such obligee is a party to the contract in such a sense as to be entitled to the proper remedies to reform or to collect the same.

To entitle a party to a decree of a court of equity reforming a written instrument, he must show first, a plain mistake clearly made out by satisfactory proofs.

He must also show that the part omitted or inserted in the instrument, was omitted or inserted contrary to the intent of both parties, and under a mutual mistake.

*E. G. Lapham*, for the plaintiffs.

*T. R. Strong*, for the defendant.

BROWN, J. This action is brought principally to reform a bond set out in the complaint, and made under the following circumstances: In May, 1838, Andrew Dunlap, of Ovid, in the county of Seneca, was the owner of 517 acres of land, situate in that town, which he desired to divide and distribute amongst his children, providing at the same time for the support and maintenance of himself and his wife, Mary, during life. He had four sons: Josiah, David, the defendant's testator, Andrew, Jr., and William; and one daughter, Jane Nevius, the plaintiffs' testatrix. He caused the land to be surveyed, and a diagram made of it. That part of it designed for his son William, consisting of one hundred acres, he conveyed to Andrew, Jr., who paid William the estimated value of it in money. On the 10th of May, 1838, he conveyed to Josiah one hundred acres, and to Andrew, Jr., one hundred acres, which included the homestead. To his son David he conveyed two hundred and seventeen acres. This included one hundred acres, the benefit of which was designed for Mrs. Nevius, as her share of his estate, and for which David was to pay her $3,000, the estimated value thereof at a future

time.  It was a part of the arrangement that Josiah, David and Andrew were to provide means for the support of their father and mother during life, and were to become legally bound therefor to the extent of the annual interest upon the four shares of the lands which had been conveyed to them, estimating each share at $3,000.  As the contribution of the share of William, conveyed to Andrew, Jr., the latter was to execute to his father a lease for life of a part of the dwelling-house and premises, which was executed and delivered accordingly.  David was to make his bond to his sister, Mrs. Nevius, conditioned to pay her $3,000, the estimated value of her share, upon demand, with a provision in respect to the payment of interest, and to which I shall presently refer, that being the subject of the controversy in this action.  Josiah and Andrew, Jr., in fulfillment of the agreement, each executed to their father their separate bond, conditioned to pay $210 annually to him, or Mary his wife, during their lives; and David, in like manner, executed to his father a similar bond, conditioned to pay $420 annually during the same time.  At the same time David executed and delivered to Mrs. Nevius the bond in suit, which is in the penal sum of $3,000, conditioned to pay to her $3,000 on demand.  It then recites that David Dunlap, the obligor, had become obligated to pay Andrew Dunlap and Mary his wife $210 yearly for their lives, being the amount of interest on this obligation, and then added: "It is, therefore, expressly understood by this condition that when the aforesaid obligation to Andrew Dunlap ceases to be obligatory, then the balance due on this obligation shall draw lawful interest, and not before.  And it is further expressly understood that in proportion to the payments made on this obligation, the payments on the other shall be diminished, and be no longer obligatory."  The provision quoted was obviously made to protect David against the double payment of interest upon the estimated value of Mrs. Nevius' share in the estate.  Whenever his liability to pay interest to his father (which was the paramount obligation) should cease by death of the obligees or otherwise, then his liability to pay interest to Mrs. Nevius upon the bond to her should commence, and

not sooner. The three bonds to the father were made to secure a fixed support for the father and mother. Their right to demand payment to the extent of the sums mentioned in the condition of each of the bonds was settled and fixed by the terms of the instruments themselves. The parents, however, agreed verbally to accept, and did accept, payment in support furnished from time to time, in such sums of money as they actually needed. Mrs. Nevius was not present at the transaction, but was at that time living in Steuben county. The bonds, including that to Mrs. Nevius, were kept by the father until the death of his wife, which occurred July 28, 1846. He then delivered the bond of Mrs. Nevius to her, and she delivered it to Josiah at his request. The other bonds were delivered over to David. Andrew Dunlap, Sen., died in March, 1851. The cost of the support of the father and mother did not amount to the sums secured to be paid upon the three bonds; and whatever it was, David paid and furnished one-half thereof, and Andrew and Josiah each one-quarter. During the period the father retained the bonds in his possession, the interest was indorsed upon them annually by the father's direction, which indorsements were made to show they were satisfied to the times of the indorsement by means of the support furnished. There were also indorsed upon the bond to Mrs. Nevius, during the same period, various payments, in all amounting to more than $2,000; and there are payments indorsed thereon subsequently in full of the sum due thereon, according to the terms of the condition as written in the bond. The plaintiffs demand judgment for $3,000, with the interest from the time of the commencement of the action, and, if necessary, that the bond to their testatrix be reformed so as to provide for the payment of interest to her thereon from the time of its date, deducting therefrom her just share of the actual costs of the support furnished the father and mother. The defendants answered, denying, amongst other things, that there was any agreement in regard to the payment of the interest, other or different from that expressed in the condition of the bond, and denying that there was any error or mistake in its form or structure. The cause

was heard at the Special Term, without a jury, where a judgment was rendered that the bond be reformed according to the prayer of the complainant, and that the plaintiffs recover from the defendants $3,028.70, the sum due thereon for principal and interest as reformed by the judgment. The defendants appealed to the General Term, where the judgment was affirmed, and thereupon they appealed to this court.

I do not concur with the learned counsel for the defendant in thinking that Mrs. Nevius was not entitled to maintain an action for the reformation of the bond to her because she was not present at nor a party to the transaction at which it was given, and that no consideration whatever therefor moved from her, and because she derived it by gift from her father some eight years after it was given. Nor do I concur with the learned counsel for the plaintiffs when he claims that Mrs. Nevius is to be regarded as the owner of the land by gift from her father, who intended to give her the use of the land during his life and subject to her share of his support. These propositions are both of them artificial and unnatural, and not supported by the evidence in the case. The defendant's proposition would, if adopted, place Mrs. Nevius in the position of an assignee taking the bond by assignment from her father — a stranger to the contract out of which it arose. She would then have taken it with its infirmities and imperfections whatever they were, and could not have asserted any right of action founded upon the original transaction. She was the obligee, and not the assignee, of the bond. The one hundred acres of land was conveyed by the father to David upon the express consideration that he should give the two bonds referred to — one to his sister for the principal sum of $3,000, and the other to the father for the interest, while the principal by the arrangement was to remain unpaid. Although Mrs. Nevius was not present, and the consideration of the bond did not proceed from her, she was nevertheless a party to the contract. The consideration proceeded from a third person — her father — who acted for her benefit and in her name, and *quoad* the money mentioned or intended to be mentioned in the condition, the defendant's testator contracted

with her. Had the condition, by mistake of the scrivener, expressed $2,000, in place of $3,000, the sum intended, there can hardly be a doubt that she would have been entitled to maintain her action to correct the error.

This brings us to consider whether the plaintiffs made such a case upon the proofs as entitled them to the relief demanded in the complaint. To entitle a party to the decree of a court of equity, reforming a written instrument, he must show, first, a plain mistake, clearly made out by satisfactory proofs. Whenever the evidence is loose, equivocal or contradictory, or is in its texture open to doubt or opposing presumptions, the relief will not be granted. (Story's Eq. Jur., 157.) This proposition is obvious, because the written instrument, carefully and deliberately prepared and executed, is evidence of the highest character, and will be presumed to express the intention of the parties to it, until the contrary appears by clear, positive and unequivocal evidence. In the second place, he must show that the material stipulation which he claims should be omitted or inserted in the instrument, was omitted or inserted contrary to the intention of both parties, and under a mutual mistake. (Id., 155.) It is not enough to show that he made a mistake himself; that, through inadvertence and error on his part, he executed an instrument, the stipulations of which do not express what he intended. He must also show that the other contracting party labored under a similar delusion. The rule is well expressed by Chief Justice SPENCER, in delivering the opinion of the Court of Errors in *Lyman* v. *The Utica Insurance Co.* (17 Johns., 373): "It is not enough in cases of this kind to show the sense and intention of one of the parties to the contract. It must be shown incontrovertibly that the sense and intention of the other party concurred in it; in other words, it must be proved that they both understood the contract as it is alleged it ought to have been, and in fact it was, but for the mistake. It would be the height of injustice to alter a contract on the ground of mistake, when the mistake arises from misconception of one of the parties in consequence of his imperfect explanation of his intentions. If it be clearly shown that

the intention of one of the parties is mistaken and misrepresented by the written contract, that cannot avail unless it be further shown the other party agreed to it in the same way, and that the intention of both of them was by mistake misrepresented by the written contract." The proof upon the trial of this action fulfilled neither of these requisites. It was vague, uncertain and equivocal at best. It consisted of the inferences and conclusions of the two witnesses present at the time of the transaction, or at a part of the time of the transaction, and not of what was said and done by the parties or actors in it. Andrew Dunlap, one of the witnesses called by the plaintiffs to make out the mistake, said: "I was present a portion of the time when the bonds were drawn. They were to be paid by maintenance. At the time the bonds were made, the deeds for the land were given. David had a deed for 217 acres, Josiah for 100 acres, and Jane for 100 acres. He gave David a deed for my sister's right of 100 acres, for which there was a separate bond given besides the bond for maintenance, that was given to my sister, the plaintiff. The interest on the $3,000 was to be paid to her, except what would pay for her share of the maintenance. There was a lease executed at the same time from me to my father." This is all, positively all that this witness says as to the omitted portion of the agreement. "The interest on the $3,000 was to be paid to her," he says. He does not say his father said the interest was to be paid to her, or that David or anybody else said the interest was to be paid to her. I think therefore it was a mere inference of his own, a conclusion of his own mind as to what would result from the arrangement, and not from any agreement or stipulation which David and his father made at the time. This certainly is not the kind of evidence referred to by the judges and elementary writers as requisite to overthrow the express words of a written instrument, and substitute other words in their place. The written language of the bond speaks in plain, clear and unequivocal terms; the parol language claimed to be substituted, to be of any effect, should be equally plain, clear and unequivocal. Josiah Dunlap, the other brother present, and who prepared

the papers, was also examined as a witness for the plaintiffs to show the mistake. He said, "I know it was my father's design to let my sister, Mrs. Nevius, have the whole benefit of the 100 acres referred to. He told me that he designed to give her the 100 acres, and instead of her selling it he sold it to my brother David." He was then asked the following question: "When you drew the bond, was it your intention to draw it so as to require David to pay the $3,000 and interest to Jane Nevius, after deducting her share of what was necessary for her father and mother's support?" The question was objected to and the objection overruled, and the witness answered, "That was my intention, it being my father's intention; these bonds were all executed at the same time." This is all the witness says upon the principal question. If the question put and answered can be deemed evidence, which I very much doubt, it does not by any means establish an agreement different from that expressed in the contract. When the witness speaks of his own intention, and the intention of his father, he does not intend to speak of what was said and done at the time, but of the legal consequences and logical conclusions which would result from what was done. If David or his father said or did anything during the negotiation indicating a different purpose from that expressed in the bonds, the plaintiffs were bound to prove what it was, and then it would become the province of the court or jury to determine the inferences and conclusions consequent thereon. The instrument cannot upon any known rule be reformed upon evidence which falls short of this. So far however from showing that anything of the kind was said, the witness, Josiah Dunlap, testified that "not one word was said about what was to be done or what the consequence would be in case it cost less than the $210, each share, for the support of my parents." The effect of this testimony was to neutralize all that the witness said in regard to the alleged mistake. It is worthy of observation that there is not one particle of proof showing or tending to show that David Dunlap, the obligor, entertained or expressed a different intention from that expressed in the bond. Concede it to be true that it does

not express the intention of his father, and what then? The mistake must have been mutual, and until it be shown that both parties were mistaken, there can be no relief in the form of reformation. David Dunlap was the purchaser of the 100 acres represented by the bond to Mrs. Nevius. It was not a gift to him, as the other 117 acres were. He paid the consideration money in the two bonds referred to, securing the interest to his father and mother during life, and the principal to Mrs. Nevius, with the interest to her whenever his obligation to pay the interest to his father ceased. The action of the father and son during the eight years that the former retained the possession and control of the bonds, is strong confirmation that this was the arrangement actually contemplated. From year to year during that period the father accepted from David less than the interest reserved, but canceled and discharged it by an indorsement upon the back of the bond. If the difference between the amount actually received, and the sum actually reserved, was, by the original arrangement, to be paid to Mrs. Nevius, why was nothing said about it? Why was it suffered to accumulate without claim or intimation of mistake until after the father's death? It is quite natural that a person will claim to enjoy what is really their own, and the father's acquiescence, and Mrs. Nevius' silence for so great a length of time, was proof quite sufficient to overcome all that was produced on the part of the plaintiffs upon the trial. It was justly and appropriately said in the court below, that "the bonds were prepared in their original form with the purpose to put the father's independence beyond a doubt." At any time during his life he could have exacted the interest in full, and could have disposed of it as he chose. Had he exacted it, would it be pretended that the bond in suit could now be reformed as directed by the court below, on showing that no such amount as the interest was requisite to his support? Being at his option to exact the whole interest or not, his omission to do so adds nothing to the plaintiffs' rights. If anything remains unpaid on the bond to Andrew Dunlap, Sen., it belongs to his estate, and not to the plaintiffs.

The judgments in the courts below should be reversed, and a new trial granted, with costs to abide the event.

DENIO, Ch. J. The bond obligatory of the defendant's testator affords evidence on its face that, at its date, the testator, David Dunlap, was indebted to Jane Nevius, the plaintiffs' testatrix, in the principal sum of three thousand dollars mentioned in it. The parol evidence shows that this indebtedness was for land sold by the father of these parties to David, which land, or the proceeds of the sale of it, was intended to be given to his daughter, Mrs. Nevius, as her portion of the family estate, to make her equal to the four sons, to each of whom he had given one hundred acres, by conveyances vesting a present interest in possession. This three thousand dollars became Mrs. Nevius' money by the tripartite arrangement between the father and this daughter and his son David, effected by the giving of the bond in question by David to Mrs. Nevius, with the assent of the father, to whom the money would have otherwise become due. As David Dunlap thus had, by immediate title, and right of enjoyment, the property for which the bond was given, he was equitably bound to pay interest to her so long as the payment of the principal should be deferred. But, according to the written obligations, all these five children, or at least four of them, William having gone away, were to give their respective bonds for the payment of $210 each, being the interest at seven per cent on the value of their respective shares of the farm during the lifetime of their father and mother or either of them. For a reason not explained, Mrs. Nevius was not to give any bond. It may have been because she was a *feme covert*, and could not execute a bond, or because she was not of pecuniary responsibility, or because she was not present when the arrangement was consummated. At all events she was not to give a bond, and she did not give any. But still she, or her share of the property, was to come under the same obligation to their father as that assumed by each of the brothers. This was arranged by doubling the amount of the condition of David's bond, and this was done

by inserting four hundred and twenty dollars instead of two hundred and ten. Then David was to be indemnified for the liability he had assumed in behalf of Mrs. Nevius. This was accomplished in this manner : David had her money in his hands, and the bond was given, as I have said, to secure its payment to her. He could secure the needed indemnity by an arrangement respecting the interest on this money, viz. : that he should retain, and not pay to her, a sum corresponding with the amount which he might have to pay on account of the obligation to his father which he had assumed on her behalf. This was the substance of the arrangement; but, unfortunately, the papers were drawn by another brother, Josiah Dunlap, who was unaccustomed to the drawing of such instruments, and did not well understand the force of language. He, however, made an express reference, though not a perfectly accurate one, to the bond which he had given to his father. He describes it as an obligation to pay him two hundred and ten dollars. It was for double that sum, but the two hundred and ten dollars was the true sum he had obliged himself to pay on her behalf. This is all intelligible enough. The reference to his bond to his father shows the intent and purpose of the arrangement respecting interest on the bond to Mrs. Nevius, and that its object was indemnity, as has been mentioned. This is made perfectly clear by the words in parenthesis, "it being the amount of annual interest on this obligation." That is, the interest on the $3,000 he owed Mrs. Nevius is withheld, on account of his having become bound to pay that interest, or an amount equal to it, to their father. Then it was expressly inserted, that when his obligation assumed on her behalf should cease to be obligatory, which would happen when the elder Dunlap and his wife should both be dead, the bond to Mrs. Nevius should commence to draw interest, and not before. There is another clause, which is intelligible enough, but not operative for the want of proper parties uniting in the instrument. It is, "that in proportion to the payments made on this obligation, the payments on the other shall be diminished, and be no longer obligatory." What

was meant was, that if he should pay the $3,000 or any part of it to Mrs. Nevius, he would no longer pay the interest on the amount of principal so paid, to his father on the obligation he had assumed on her behalf to him. This is inoperative, as I have said, and it is because the father, the obligee in the other bond, was not a party to this. But still it shows very clearly the nature of the transaction.

Now I think that if for any reason the obligor, David Dunlap, should be relieved from the payment of what he had undertaken to pay on her behalf, or any part of it, during the lifetime of the annuitants to whom it was payable, the benefit of such relinquishment ought to inure to the advantage of Mrs. Nevius, whose debt was thus forgiven and extinguished. If it had been a positive indemnity by way of property pledged, or an indemnifying obligation, the pledge would in equity be required to be given up, or the indemnifying bond surrendered, and so far as the provisions of the bond for the payment of the $3,000 interposed an obstacle, it should be reformed, in order to carry out the intention of the parties.

The papers actually executed show the error almost as strongly as any parol proof could; but the parol evidence is satisfactory to my mind to explain the transaction fully. The father did not want or expect to have the whole $1,050 (or $820, if William gave no bond), which the bonds represented, paid to him; but they were taken to guard against contingencies which were not expected to happen, but which might by possibility occur. In the meantime he received such small sums as his necessities required, and regularly made indorsements on the bonds setting forth that the annual payments, as they became payable by the terms of the obligations, were paid. I think it is very clear equity that Mrs. Nevius, or her representative, should have the benefit of this relinquishment, so far as it concerns her obligation, which the defendant's testator had assumed.

Holding the case on the part of the plaintiff proved, I see no formal objection to the relief which was adjudged to her representatives. The point that the representatives of the

elder Dunlap should have been made parties, is not tenable. The bond runs to Mrs. Nevius, and it was delivered to her father for her use. It immediately took effect as an operative bond in her favor. It is not verbally in the terms of the obligation actually assumed, that the obligor should pay such interest as he did not pay the father; but this can be remedied by making it conform to the agreement, and this the court has done. The benefit of this accrues to the estate of Mrs. Nevius, and not to that of the father, to which nothing is due.

I do not think it was necessary to make the representatives of the elder Dunlap parties, for the purpose of seeking a reformation of the bond of David to his father. As I understand the evidence, that bond was given up to David before his father's death, and there is no evidence of any claim having been made under it after the death of the father.

I am in favor of affirming the judgment appealed from.

Judgment reversed, and new trial ordered.