154 WEST 14TH STREET COMPANY, INC., Plaintiff, *v.* D. A. SCHULTE, INC., Defendant.

Supreme Court, New York Special Term, October, 1923.

*Reformation of instruments — lease — reformation can only be granted where there is a mutual mistake or mistake on one side and fraud on the other by evidence clear and convincing — when equity will not grant relief.*

ACTION to reform a lease.

*Joseph I. Green,* for plaintiff.

*Jerome Eisner (Charles S. Fettretch,* of counsel), for defendant.

BURR, J. This action is brought to reform a written lease dated May 22, 1918, of the corner store in No. 154 West Fourteenth street, borough of Manhattan, made by the Adams Land and Building Company, by striking therefrom a provision allowing defendant, as tenant, the privilege of a renewal for five years, commencing July 1, 1923, at an annual rental of $2,000, which was the rental during the original term of the lease. Plaintiff is and has been since April 18, 1920, the owner of the building in which said store is located. The lease is on a printed form prepared by the lessee, D. A. Schulte, Inc., and was drawn by one Johnson, the broker in the transaction, for the said Adams Company. It begins: " This agreement between Adams Land & Building Company, a New York Corporation, as Landlord, and D. A. Schulte, Inc., a corporation organized under the Laws of the State of New York, with its principal business office at 384–6 Broadway, Borough of Manhattan, City and State of New York, as Tenant. Witnesseth: That the said Landlord does demise and let unto the said Tenant and the said Tenant does hire and take from the Landlord All that space known and designated as the corner store in the premises known and designated as number one hundred and fifty four (No. 154) West Fourteenth Street, in the Borough of Manhattan, City,

County and State of New York, being approximately (18′ x 40′) eighteen feet by forty feet and designated as (A) as per attached diagram * * * For the term of five years to commence on the 1st day of July, One thousand nine hundred and eighteen, to be used and occupied for the sale of cigars, cigarettes, tobacco, smokers articles, or a legitimate business upon the conditions and covenants as following: 1st. The tenant shall pay the guaranteed annual minimum rental of Two thousand dollars in equal monthly payments on the first day of each and every month during the term." Then follows on the first page of the lease printed paragraphs numbered respectively, 2d, 3d, 4th, 5th, 6th, 7th, 8th, 9th, and 10th. On the reverse side of that page appear eight typewritten paragraphs numbered, respectively, 11a, 11b, 11c, 11d, 11e, 11f, 11g and 11h. Of these paragraphs 11f reads as follows: " The tenant shall also have the privilege of renewing this lease for a further term of five years at the rate of twenty-five hundred ($2500) dollars per annum, provided they signify their intention of so doing six (6) months prior to the expiration of the lease." There is a separate sheet attached, being a blue print of the space leased, and then follows the second and final page of the printed form of lease. On this final page there are printed paragraphs numbered, respectively, 11th, 12th, 13th, 14th, 15th, 16th and 17th, followed by the following clauses printed, but not numbered: "And the said landlord doth covenant that the said tenant on paying the said yearly rent and performing the covenants aforesaid, shall and may peaceably and quietly have, hold and enjoy the said demised premises for the term aforesaid, and shall have the option to renew the within lease for a period of five years at the same rental. And it is further understood and agreed that the covenants and agreements contained in the foregoing lease are binding upon the parties hereto and their respective heirs, administrators, successors, legal representatives and assigns. In Witness Whereof," etc. It appears from the evidence that in the early part of November, 1917, Mr. Johnson, who was the manager of the downtown rental department of Pease & Elliman, learned that the ground floor of the building now owned by plaintiff was for rent, and on November fifteenth he wrote a letter to E. S. Willard & Co. asking for a ground floor plan and schedule of rentals. E. S. Willard & Co. were then and had been for years in general charge of the building as agent for the Adams Land and Building Company. The following day Willard & Co. replied, giving prices and diagram showing the manner in which space was to be divided. At this time Johnson had not had any previous communication with defendant in respect to the latter's leasing any part of such space. Shortly afterwards Johnson submitted the property to Mr. Tankoos,

who was then in charge of defendant's real estate department. In the latter part of December, 1917, an offer was made by Tankoos on behalf of defendant to take a ten years' lease at a scaled rental commencing at $1,500 per year and averaging for the full term $2,000 a year. This offer was considered. It was for a space eighteen feet in width by twenty-six feet in depth. After some delay the offer was refused, but before such refusal and on January 23, 1918, defendant had modified its offer by increasing to forty feet the depth of the space to be leased to it. The negotiations were then dropped for a time and there was no further correspondence between any of the interested parties until April 4, 1918. Five days thereafter Johnson wrote Willard & Co. that he believed he could close with defendant for a ten-year lease of a space eighteen feet by twenty-six feet at a scaled rental of from $1,500 to $2,500 per year. This proposition was apparently acceptable to Willard & Co., as leases in duplicate were prepared by Johnson, sent to Willard & Co. and returned by the latter to Johnson on April 15, 1918, with a letter stating: " We have inserted a few clauses which are in the standard forms of the Adams Land & Building Company. Kindly have both copies signed by proper parties, and return to this office." These leases were not produced upon the trial, and plaintiff did not show what had become of them, but there is no dispute as to their contents. Johnson then, on April twenty-third, wrote Willard & Co. as follows: " E. S. Willard & Company, 52 William Street, New York, N. Y. Attention Mr. Bang. Dear Sir — Re Store, 7th Avenue & 14th Street. The Schulte Cigar Company have written me the following letter, which is self explanatory. ' Re 7th Ave. & 14th Street. Lease submitted is returned herewith. Our construction superintendent has very thoroughly investigated the proposition and advises that the store cannot be properly equipped with a suitable entrance from the subway unless the entire depth of 40 feet is included. This department has also had a more thorough investigation made of the traffic and district in general and is of the opinion that the location offers no special advantages for a branch of the Schulte business, and even with completion of the contemplated improvements which might develop the district that there would be no real business on the corner for a year or more following the completion and operation of the entire 7th avenue subway line. Therefore it is our decision to discontinue negotiations unless we can secure the full depth of 40 feet for a term of 10 years at a straight rental of $2,000 per annum.' After considering same the writer would be glad to be advised as to your disposition in this matter. Very truly yours, Theo. D. M. Johnson, Manager, Rental Dept. Downtown. TDJ-B." One week later, on April twenty-fifth, after Johnson had

been in communication with Willard & Co. and Tankoos, he wrote the following letter: " E. S. Willard and Co., 52 William Street, New York, N. Y. Attention Mr. F. S. Bang. Dear Sir — I have talked to the Schulte Company regarding 7th Avenue and 14th Street, and I am authorized to close the deal on the basis of two thousand ($2,000) dollars for five years with the privilege of five years at twenty-five hundred ($2,500) dollars, as outlined in the original proposition, on which leases have been drawn, a copy of which is herewith inclosed, with the exception that they would like to have you build the entrance from 7th Avenue. If you will have the leases drawn as soon as possible I would be glad to secure the signature. We will, of course, expect you to insert a clause in the lease protecting Pease & Elliman as to their commission should the Schulte Company exercise their privilege to renew for a further five years. Very truly yours, Theo. DeM. Johnson, Manager, Rental Dept., Downtown. TDJ-B. Inclosure." And at the same time Johnson wrote Tankoos as follows: "April 25th, 1918. Mr. S. J. Tankoos, 386 Broadway, New York. Dear Mr. Tankoos: Confirming telephone conversation I have this day closed lease on southeast corner of 7th Avenue and 14th Street for $2,000 per year for five years, with privilege of five years at $2,500 per year, on the basis as agreed upon on the original drawing of the lease. Very truly yours, Theodore D. M. Johnson, Manager, Rental Department. TDJ-B." The space then in question was eighteen feet by forty feet. Leases were prepared by Johnson on this basis and sent by him to Tankoos, who, on April twenty-seventh, sent to Mr. Bang of Willard & Co. a corrected copy and asked him to rewrite lease in duplicate as corrected. This lease contained the typewritten provision for five years' renewal at $2,500 per year. On May first Willard & Co. returned the copies of the lease to Johnson stating that the wishes of Tankoos had been " practically carried out. * * * But there are some things which we know the owners would not agree to and have not indicated them." Also inclosed was a letter stating what alterations would be made by the Adams Land and Building Company. This letter referred to the lease for five years, no mention being made of the renewal privilege, but it is clear from the testimony and exhibits that the lease still contained the typewritten provision for five years' renewal at $2,500 per year. The leases were then redrawn by Johnson and two copies were sent by him to Tankoos. Another copy was sent by him to Bang and submitted by the latter on May fourteenth to Spencer, the vice-president of the Adams Land and Building Company. There were at this time one or more copies of the lease in the possession of each principal, all of these copies having been drawn by Johnson in accordance with his two letters

of April twenty-fifth, all of which leases were on the Schulte form and all of which contained both the typewritten clauses [11 (f)] giving the defendant the privilege of five years' renewal at $2,500 per year and also the printed clause for a renewal for the same period at the original rental of $2,000 per year. The renewal clause for five years at $2,500 had been tentatively agreed to by Tankoos on behalf of the defendant subject to the approval of defendant's president, Mr. D. A. Schulte, and Bang had likewise agreed to this clause, subject to the ratification of his action by Mr. Spencer. Bang admitted that he knew when he took the leases to Mr. Spencer that they contained the typewritten provision for a renewal. Tankoos testified that before receiving the leases from Johnson the latter had stated to him that this proposition was acceptable to the owner of the building. After Spencer received the proposed lease he went to view the premises with Bang to determine finally what had best be done in the interests of the landlord, and after looking the situation over Spencer testified that he told Bang that he could not give any renewal privilege to defendant. Bang's version of what Spencer told him at this time is somewhat different as appears from the former's testimony: " Q. After he refused to sign them what did you do? A. I started negotiating with Mr. Johnson again. Q. Did you talk to Mr. Johnson? A. Yes. Q. Tell us what you said to Mr. Johnson after you came back from Mr. Spencer. A. I told Mr. Johnson that Mr. Spencer would not agree to a privilege of renewal at $2,500, that he would make a straight lease of five years at $2,000 and five years at $2,500, but he would not give a privilege of renewal, and the reason for that was because the store had been increased in size and $2,500 was the rent we had expected to get for the smaller store." It is clear, however, that the lease as presented by Bang before its execution by Schulte was not satisfactory to Spencer. Tankoos testified that when he told Mr. Schulte of the tentative agreement for a five-year renewal at $2,500 per year, the latter refused to ratify such agree-- ment or to change his previous opinion of the location outlined in the letter of April twenty-third, and stated that all he would pay for the renewal period was $2,000 a year. This testimony is cor- roborated by Schulte. Tankoos further testified he then informed Johnson of the position taken by Schulte and told him it was Schulte's last word on the matter, that he would have the leases executed by Schulte after they had been modified in accordance with the latter's decision and that Johnson could take the executed leases to the landlord and close upon Schulte's terms or bring back the leases so that the signatures could be torn therefrom. Tankoos accordingly prepared the leases for execution by Schulte by striking out the words " and toilet " in paragraph 10, the word " sixty "

in paragraph 12 and all of paragraphs 11f, 11 and 15, and by inserting the words " and complete before July 1st, 1918," in paragraph 11h.    That this was done by Tankoos is not questioned by plaintiff. Two copies of the lease thus changed were executed by Schulte, sent to Johnson and by him delivered to Bang.   Later one of these copies executed by Spencer was sent by Bang to Johnson, and coming into the possession of the defendant was duly recorded by defendant on May 28, 1918.   Johnson corroborated this testimony of Tankoos and further testified that when he delivered the copy leases to Bang after their execution by Schulte he told Bang that all Schulte would pay for the renewal period was $2,000 per year. This was denied by Bang, but the latter on cross-examination frankly admitted that he did not remember what was said at that time.   In December, 1919, the property was sold by the Adams Land and Building Company to the A. & H. Investing Company, Inc., and the latter on April 28, 1920, conveyed the property to plaintiff.   On February 16, 1922, defendant notified the A. & H. Investing Company, Inc., of its intention to exercise its renewal privilege, and on the same day sublet a portion of the demised premises to Peter Domenicos for the term of five years commencing July 1, 1923.   This action was not commenced until on or after May 24, 1922.   That the rental value of the premises occupied by defendant has greatly increased appears from the fact that plaintiff has made a lease to the Corn Exchange Bank of the entire ground floor, which lease provides that so long as defendant remains in possession the bank is to receive an allowance at the rate of $6,000 per year.   It also appears that defendant has sublet a very small part of the leased premises for $1,800 per annum.   On this state of facts the plaintiff seeks to have the lease reformed by striking out the printed renewal clause on the ground that at the time the owner, Adams Land and Building Company, signed the lease said Adams Land and Building Company had no knowledge of such printed renewal clause being in the lease and believed that no renewal clause remained in the lease after the typewritten clause for renewal had been stricken out; that the signing of such lease with the printed clause for renewal was the result of mistake on the part of the Adams Land and Building Company and fraud on the part of the defendant.   The plaintiff, 154 West 14th Street Company, Inc., offered evidence to support its claim that at the time it acquired the property it believed that such lease did not contain any renewal clause and that it was so represented to it by the then owners of the property.   Spencer says that at the time he signed the lease he did not know of the existence of the printed clause for renewal and that if he had known of it he would not have signed the lease. Schulte says he knew when he signed the lease after striking out

the typewritten renewal clause that such printed clause for renewal was there; otherwise he would not have signed the lease. Tankoos testified he knew it was in the lease when it was executed. So did Johnson. I do not think the evidence sufficient to justify a decree to reform this lease on the ground of mutual mistake or of mistake on the part of the owner, Adams Land and Building Company, and fraud on the part of the defendant tenant Schulte. The making of the lease was not the matter of an hour or a day. It was not done in a hurry; it was a subject of negotiation for months. Conferences and much correspondence were necessary before it was finally concluded. The evidence clearly shows that ample opportunity was afforded both the owner and the proposed tenant to examine all the forms submitted. The form finally executed on the twenty-second day of May was in the hands of the owner, Adams Land and Building Company, from about the end of April or the beginning of May. The parties to the lease were dealing with each other at arm's length. The lawyers for the Adams Land and Building Company examined the proposed form of lease, so did its agents who were directly in charge of the property. Concededly, the presence in the lease as originally drawn of two clauses providing for a renewal on different terms was a mistake. It was the mistake of Johnson, who represented the owner, the Adams Land and Building Company, as broker, and who was paid commission by said company as such broker. That mistake or inadvertence cannot be said to be the fault of the defendant. The owner had as good an opportunity to examine the lease for errors and mistakes as had the tenant. Ordinary prudence required careful reading by the landlord of a lease prepared on a form used by the tenant. The fact is neither the owner nor its representatives took the trouble to make a careful examination of the terms of the lease. They took things for granted. The evidence clearly shows that if any mistake occurred at the time of the execution of the lease it was due entirely to the inexcusable negligence of the owner. Reformation can only be granted for excusable mistake on the part of the person seeking to have the agreement reformed. In *Metzger* v. *Ætna Insurance Co.*, 227 N. Y. 411, Judge Collin said (at p. 415): " If the insured obtained or held a mistaken view or belief concerning the agreements of the policy, the fault or negligence of its president and representative was the cause. A mere reading of the policy would have made him and the plaintiff know the agreements the plaintiff was accepting and entering into. To hold that a contracting party who, through no deceit or overbearing inducement of the other party, fails to read the contract, may establish and enforce the contract supposed by him, would introduce into the law a dangerous doctrine. Of course, the doctrine does not exist. It

has often been held that when a party to a written contract accepts it as a contract he is bound by the stipulations and conditions expressed in it whether he reads them or not. Ignorance through negligence or inexcusable trustfulness will not relieve a party from his contract obligations. He who signs or accepts a written contract, in the absence of fraud or other wrongful act on the part of another contracting party, is conclusively presumed· to know its contents and to assent to them, and there can be no evidence for the jury as to his understanding of its terms." In the case at bar the leases were repeatedly redrawn. The leases were signed by the defendant Schulte before they were signed by the Adams Land and Building Company and paragraph 11f was stricken out and other changes made by Tankoos before the leases were submitted to and executed by Spencer. The negligence of the Adams Land and Building Company is imputable to plaintiff, as the latter stands in the shoes of the former. It is clear that plaintiff also was guilty of negligence at the time it acquired title, as its attorney testified that no examination of the recorded copy of the lease in the register's office was made, and the original lease received by plaintiff upon the purchase of the property was not even read. It was represented to be a five years' lease and plaintiff accepted that as the fact. There is no evidence of fraud on the part of the defendant. The testimony of Schulte and Tankoos as to the circumstances attending the execution of the lease by Schulte is uncontradicted. Plaintiff's predecessor, the Adams Company, was fully apprised as to the conditions under which Schulte would take the lease before it was actually signed by Spencer representing the Adams Company and after it had been signed by Schulte. I am satisfied from the evidence that the agreement mutually arrived at for the leasing of these premises was that contained in the lease in the form executed by the parties. Fraud cannot be predicated on silence. There was no relation of confidence and trust between the parties to the issue. Even if defendant had known that the plaintiff's predecessor in title was acting under a misapprehension of fact in signing the lease there was no duty imposed upon defendant to speak, and its silence under such circumstances would not constitute fraud. *People's Bank* v. *Bogart*, 81 N. Y. 101. Fraud cannot be presumed but must be affirmatively alleged and proved. The evidence adduced to reform this lease is not of that convincing and substantial character which the law requires. *Christopher St. R. Co.* v. *23d St. R. Co.*, 149 N. Y. 51, 58; *Schall* v. *Schwartz & Co., Inc.*, 181 App. Div. 397, 399. It was the duty of the landlord to use reasonable care and diligence to prevent errors or omissions in the lease as executed. Where such reasonable care and diligence is lacking equity will not grant relief and thus encourage culpable negligence on

the part of those whose duty it is to make all due inquiries. See *Met. El. R. Co.* v. *Johnson*, 84 Hun, 83, 88; affd., 158 N. Y. 739. The party seeking the reformation must prove that there was a mutual mistake, or mistake on one side and fraud on the other, by evidence that is clear, positive and convincing. It is to be presumed that the written instrument was carefully and deliberately prepared and executed, and, therefore, it is evidence of the highest character and will be regarded as expressing the intention of the parties to it until the contrary appears in the most satisfactory manner by proof of the most substantial and convincing character. *Nevius* v. *Dunlap*, 33 N. Y. 676. This high degree of proof is properly required by courts of equity in the exercise of the great caution necessary in reforming written instruments. Plaintiff has wholly failed to establish its claim for the reformation of the lease in question on the ground of mistake on the part of the owner and fraud on the part of the tenant. Judgment for defendant. Submit findings and decision in accordance herewith.

Judgment accordingly.