Nott, J.,
delivered the opinion of the court:
This is an action brought to recover $32,239 upon a contract for the sale of horses, and for their subsistence.
. In November, 1863, Captain O. E. Fuller, an officer in the Quartermaster Department, acting directly under the orders of the Quartermaster General and in conjunction with the Cavalry Bureau, (a bureau attached to the War Department,) agreed with the claimant that the defendants should purchase so many cavalry horses, not exceeding four hundred, as he should present for inspection at Rochester, New Tork, on the 11th December following. The horses were to be such as would pass inspection, and the defendants were to pay for them $130 apiece. The contract was not in writing.
*69 At tlie time and place appointed, the claimant was ready and willing to deliver three hundred horses pursuant to the agreement, but the inspecting officers refused to inspect them. During the following spring two hundred aud seventy-four were accepted by the defendants, fifteen were rejected by reason of injuries received during the winter, and eleven had died. The fifteen rejected the claimant sold for account of the defendants, and they brought just half the contract price. The claimant seeks to recover for the cost of subsisting the horses, for his loss on the fifteen horses rejected, and the contract price of the eleven horses that died.
The action of the inspecting officers was caused by orders received from the Chief of the Cavalry Bureau forbidding the further purchase of horses. They construed these orders to apply to horses already contracted for, and accordingly refused to inspect the claimant’s.
Therefore the claimant applied directly to the Chief of the Cavalry Bureau for redress. That officer replied that the claimant should “ build corrals or barns for the horses, feed them well during the winter, take good care of them, and that the government would accept them in the spring and pay for their keeping.” The claimant shows that he complied with these directions.
The officer who made this purchase was specially detailed to that service by the Quartermaster General. A jmblic exigency demanded an immediate supply of cavalry horses, and Captain Fuller was sent to procure them in the most 'expeditious manner. The ordinary channels of supply had ceased to bring horses to the government, because the ordinary dealer had found that after he had collected a quantity the order to purchase would be revoked and the horses left on his hands. Hence the special condition of this agreement: that the defendants should take all the horses, not to exceed four hundred, which the claimant should produce on a certain day.
The Cavalry Bureau, which made the further agreement with the claimant that he should subsist the horses till spring, at the expense of the government, was a “ bureau attached to the War Department,” having “ charge of the organization and eqiiipment of the cavalry forces” and ufor the mounts and remounts of the sameP It was established by an order of the War Department of July 28, 1863, (General Orders No. 236.) Under that order “ the purchases of all horses for the cavalry service” were to *70 be made “ by officers of the Quartermaster’s Department, under the direction of the Chief of the Cavalry Bureau,” and “ depots ” were to be established ufor the eolleetion, care, and training of crnalry horses, which depots were to be “ under the general Charge of the Cavalry Bureau
' Upon these facts there are several points making for and against the claimant which are plain:
1. The “Act to prevent and punish fraud on the part of officers intrusiedivith making contracts for the government,” (2d June, 1862, 12 Stat. L., p. 411,) makes it the duty of the Secretaries of the War, Navy, and Interior Departments “to cause and require every contract made by them,” “or by their officers under them,” “ to be reduced to toriting and signed by the contracting parties.” The construction given to that act by this court (Henderson’s Case, 4 C. Cls. R., p. 75) is that the act is mandatory and obligatory upon the contractor as upon the officer. The oral agreement, therefore, with Captain Fuller, as an executory contract, was void.
2. The statute also extends not merely to quartermasters and ordinary purchasing agents, but to all officers in the War, Navy, and Interior Departments and to the Secretaries themselves. It also embraces “ every contract” made by them. The Chief of the Cavalry Bureau was invested with ample power and complete discretion by the War Department over the subject-matter of the contract, but no power or discretion which the War Department could give would authorize him to legally bind the defendants in an illegal way. It is therefore evident that the claimant’s further oral agreement with the Chief of the Cavalry Bureau was likewise, as an executory contract, void.
3. But this court has held that the act of 1862 is, as between the government and its contractors, a “statute of frauds.” (Lindsley’s Case, 4 C. Cls. R., p. 359.) It does not prohibit contracts, but only regulates the manner of making them. - Performance on the one side and acceptance bn the other are, to a certain extent, sufficient to take a case out of the prohibition of the statute and to leave it within the equitable rule of implied contracts. If in this case there was a faithful performance on the part of the contractor, and a benefit received on the part of the government, there is no reason why it should not operate as a legal ratification by the defendants of the agreement. Therefore the whole ease turns on this subsequent transaction. If the defendants did accept the horses in the spring under the *71 agreement made in tbe fall, at the same price and in their improved condition, they must be deemed to have taken them with the burden of their winter’s keeping, and by reaping the advantages to have ratified the obligations of their agent’s agreement. On the contrary, if the claimant in the spring-ignored his unbinding bargain of the fall before, selling to the defendants by a new agreement and receiving a better price, there can be no propriety in the court affirming a transaction which the claimant has himself ignored.
It does not appear positively in the evidence whether the agreement was thus ratified or disavowed. The learned counsel for the claimant seems to rely upon the presumption that doubtless would arise if the transactions had been between two men. But the government has so many agencies, and acquires its property through so many channels, that it would be a dangerous doctrine that we should use against it all the presumptions that a court would turn against an individual. It is true that the defendants might show, in avoidance of the presumption, that they bought the horses through another quartermaster at an advanced price, and with no pretense on the part of the claimant that they already belonged to the government ; and it is of little moment bjr which party the actual circumstances of the transaction are shown; but after due reflection we incline to think that the safer rule is to hold that the burden of proof is here upon the claimant.
Believing that this proof can be readily supplied, and thinking that the claimant cannot justly be held to have anticipated its necessity, the case will be remanded to the general docket for further proof on this point, if the claimant so elect within twenty days. On failure of the claimant to file such election within the prescribed time, the judgment of the court will be entered dismissing the petition.