UNITED STATES v. NEW YORK & P. R. S. S. CO.

(District Court, S. D. New York.   July 3, 1912.)

1. UNITED STATES (§ 66*)—CONTRACTS—VALIDITY—BREACH BY CONTRACTOR.

Rev. St. § 3744 (U. S. Comp. St. 1901, p. 2511), requiring the Secretary of War, Secretary of the Navy, and Secretary of the Interior to cause all contracts made by them on behalf of the government, or by officers under them appointed to make such contracts, to be reduced to writing and signed by the parties and a copy of every such contract to be filed in the returns office of the Department of the Interior, is not a statute of frauds, but an enactment for the protection of the government, and cannot be invoked by one whose bid for a contract has been accepted but who refuses to sign the formal contract when tendered to relieve him from liability for damages sustained by the government by reason of such refusal to perform the contract made by his bid and its acceptance.

[Ed. Note.—For other cases, see United States, Cent. Dig. § 49; Dec. Dig. § 66.*]

2. UNITED STATES (§ 142*)—BREACH OF CONTRACT—DAMAGE.

Where defendant was unable to fulfill its contract with the Navy Department to transport two cargoes of coal of 4,000 tons each from Atlantic ports to San Francisco, and the department at its request diverted two other cargoes which had been sent to Honolulu to take their place at a cost per ton in excess of the contract price, defendant is liable in damages for all the extra cost to the government of such diversion, although the two cargoes somewhat exceeded 8,000 tons.

[Ed. Note.—For other cases, see United States, Cent. Dig. § 140; Dec. Dig. § 142.*]

3. UNITED STATES (§ 141*)—ACTION FOR BREACH OF CONTRACT—EVIDENCE.

Where defendant, being unable to fulfill a contract with the Navy Department to transport two cargoes of coal, requested the department to procure transportation of the coal by diverting other tonnage under charter to other ports, which was done, in an action by the United States to recover damages for breach of the contract, its correspondence with other contractors resulting in such diversion was admissible to show what it had done pursuant to such request and the additional cost it incurred in procuring the transportation.

[Ed. Note.—For other cases, see United States, Cent. Dig. §§ 136–139; Dec. Dig. § 141.*]

At Law.   Action by the United States against the New York & Porto Rico Steamship Company.   Trial to court.   Judgment for plaintiff.

Isaac H. Levy and Addison S. Pratt, Asst. U. S. Attys.

James H. Hayden, of Washington, D. C., and Burlingham, Montgomery & Beecher, of New York City, for defendant.

MAYER, District Judge.   This case grows out of transactions between the Bureau of Supplies and Accounts of the Navy Department and defendant, in relation to the transportation of two cargoes of coal from loading ports on Chesapeake Bay to San Francisco.

The complaint alleges three causes of action, all looking to the same result.   In the first, plaintiff claims damages for breach of contract due to the failure of defendant to transport the coal in question; while, in the second and third, it claims compensation for

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

services alleged to have been rendered or money expended for defendant by plaintiff in procuring transportation of the coal.

There is some dispute as to the facts, but in the main they are not contested. By stipulation of the parties, the case was tried without a jury.

The defendant insists that it is not liable because the Act of June 2, 1862, c. 93, 12 Stat. 411, was not complied with, and therefore that there was not, in law, any contract between the parties.

[1] While this half century old statute has been construed in a number of cases and in departmental decisions where it was sought to hold the government, this is the first case where, on the claim of noncompliance with the act, the question of the liability of the contractor has been presented. The act was entitled "An act to prevent and punish fraud on the part of officers intrusted with the making of contracts for the government" (originally 12 Stat. 411; re-enacted as section 3744 et seq., R. S. [U. S. Comp. St. 1901, p. 2511]), and is as follows:

"Sec. 3744. It shall be the duty of the Secretary of War, of the Secretary of the Navy, and of the Secretary of the Interior, to cause and require every contract made by them severally on behalf of the government, or by their officers under them appointed to make such contracts, to be reduced to writing, and signed by the contracting parties with their names at the end thereof; a copy of which shall be filed by the officer making and signing the contract in the Returns Office of the Department of the Interior, as soon after the contract is made as possible, and within thirty days, together with all bids, offers, and proposals to him made by persons to obtain the same, and with a copy of any advertisement he may have published inviting bids, offers, or proposals for the same. All the copies and papers in relation to each contract shall be attached together by a ribbon and seal, and marked by numbers in regular order, according to the number of papers composing the whole return."

In the case at bar, the Bureau of Supplies and Accounts of the Navy Department issued an invitation dated November 9, 1909, calling for tenders for the transportation of coal from loading ports on Chesapeake Bay to San Francisco. In the fall of 1909 and the early part of 1910, and for about a year prior thereto, a fleet of eight armored cruisers was cruising up and down the Pacific Coast, having San Francisco as its primary base and Puget Sound as its secondary base. It was the duty of the Bureau, and more especially of the paymaster in charge, to see that the depots at Mare Island and California City were kept filled to a certain capacity in order to provide the Pacific cruisers with coal; the capacity of Mare Island being about 28,000 tons, and of California City about 24,000 tons. There are several other coaling stations on the Pacific, among them one at Honolulu.

In November, 1909, the fleet was on its cruise to the testing grounds at Magdalena Bay, and the Navy Department expected it would return north arriving in San Francisco some time in February, there to remain for several weeks. It was desired and intended by the Department to keep the fleet supplied with coal for its needs, and to that end arrangements were undertaken and the invitation of November 9, 1900, was issued.

This invitation of November 9, 1909, stated that the Bureau of Supplies and Accounts would receive written tenders until noon of November 13, 1909, for transportation of two or four cargoes not less than 4,000 tons each, of coal from certain loading points named, to either Mare Island or San Francisco. It was further stated that as deliveries were desired within 60 days, at least two carriers were to be ready to load at any time before December 10, 1909, or earlier if possible, and the remainder within 15 days thereafter, each vessel to give at least 10 days' notice prior to reporting to load, and if vessel was not named in proposal she must be nominated at least 10 days before loading.

Under date of November 13, 1909, defendant through Mr. Wrigley, the manager of its Chartering Department, submitted its tender as follows:

"First. For the transportation of two or four cargoes of coal from Norfolk, Newport News, Baltimore or Philadelphia to Mare Island or San Francisco.

"Second. Two (2) steamers to be ready to load previous to December 10, 1909 (in all probability we will declare a steamer November 15th, that will make prompt loading), and two (2) steamers to load between December 10 and 25, 1909.

"Third. Rate of freight to be, for the two (2) steamers to be ready to load before December 10, 1909, three dollars and fifty-eight cents ($3.58) per ton of 2,240 lbs.; for the two (2) steamers between December 10 and 25, 1909, three dollars and thirty-three cents ($3.33) per ton of 2,240 lbs.

"Fourth. All other terms to be the same as usual Navy Department conditions for the shipment of coal."

On the same day the Paymaster General telegraphed defendant:

"Your offer one steamer December tenth twenty fifth canceling and one steamer December twenty fifth canceling but for loading on date satisfactory to Bureau accepted at three dollars thirty three per ton each steamer. Usual Bureau conditions to govern."

And two days later Mr. Wrigley wrote the Navy Department, Bureau of Supplies and Accounts, as follows:

"We beg to acknowledge receipt of your telegram of November 13th, accepting our offer of one steamer to make loading at Philadelphia, Baltimore, Norfolk or Newport News, between December 10th and 25th; and one steamer to report for loading any time previous to December 25th, on date satisfactory to the Department, for Mare Island or San Francisco, at $3.33 per ton, and we will in due course advise you what steamers we will tender on this business."

Thereafter correspondence followed between the Bureau and the defendant, with reference to the nomination of steamers by defendant until November 30, 1909, when Mr. Wrigley informed the Bureau that it had not been able to secure the steamer it had in view. Interviews began about December 4, 1909, between Mr. Hayden, the attorney for defendant acting on its behalf, and Lieutenant Commander Peoples, acting on behalf of the Bureau and the Department. The substance of these interviews was that the defendant found itself unable to comply with the tenders, a situation due, as it claimed, to a combination which had resulted in a sudden and unprecedented increase of charter rates for foreign shipping. Mr. Hayden asked for an extension of time, but his request was not granted.

On December 9, 1909, the Bureau confirmed the position which it had consistently taken, writing the defendant as follows:

"Referring to the Bureau's acceptance of the offer contained in your letter of November 13, 1909, for two steamers for San Francisco Harbor which are to be covered by Bureau requisition No. 73 and to subsequent correspondence in connection therewith:

"The time for nomination both of these steamers is drawing to a close, inasmuch as they must be ready to load not later than December 25, 1909, and according to the conditions, they must be nominated 10 days before. The Bureau expected that one of these steamers would be ready to load about December 10.

"Both of these steamers must be nominated not later than the close of business on December 15, 1909, and the Bureau would be very glad if you could nominate one of them at once because the cargoes of coal which these two steamers are to transport to the western coast will be urgently needed by the time the vessels arrive.

"The Bureau received a visit from your Mr. Hayden about one week ago, and it was pointed out to him the necessity of your furnishing these steamers on time; and the Bureau trusts that there will be no delay in nominating and having them ready at loading port by the dates specified.

"Please telegraph the Bureau upon receipt of this letter as to their status.

"By direction of the Paymaster General."

On December 11, 1909, Mr. Hayden received from the Navy Department formal proposal blanks made out for signature by defendant, in contemplation of its tendering transportation called for in the invitation of November 9th and accepted by defendant's letter of November 13th.

These blanks were never signed, but on December 14, 1909, Mr. Hayden notified the Paymaster General unequivocally of the inability of defendant to furnish the transportation tendered. At the same time, Mr. Hayden requested the Bureau to procure. transportation—

"either by diverting tonnage already under charter to your Department for other ports, or by securing new tonnage in the general market, provided, of course, that such transportation can be secured by the Department by one of those means at a reasonable cost."

On December 14, 1909, the Bureau again called for written tenders which it would receive up to noon December 18, 1909, for the same number of cargoes and the same tonnage of coal. The bids received were far in excess of that which had theretofore been made by defendant; the lowest being at the rate of $4.49 per ton for two cargoes to report for loading on January 25, 1910.

Meanwhile Lieutenant Commander Peoples had opened up negotiations with Baker Transportation Company to divert coal cargoes of the Falls of Orchy and Earl of Elgin from Honolulu to San Francisco.

There is some difference in recollection between Mr. Hayden and Lieutenant Commander Peoples as to whether the Department was arranging to divert this tonnage irrespective of the failure of defendant to furnish transportation or because of that failure.

Where, as here, there have been several interviews and telephone conversations, it is quite possible for two truthful men to differ in recollection; but I incline to the view that the recollection of the Lieutenant Commander is correct, and especially so because it is

borne out by the correspondence between Mr. Hayden and the Bureau as well as by the sequence of events. It was quite apparent to the Bureau that defendant would fail in its promises, and the Lieutenant Commander acted with foresight and prudence, and I am fully satisfied that the tonnage of the two vessels above mentioned was diverted from Honolulu to San Francisco or Mare Island to take the place of tonnage which defendant was unable to furnish.

Plaintiff paid to the Baker Transportation Company the sum of 85 cents per ton additional on 11,388 tons for this diversion, thus making a total additional expense to plaintiff of $9,679.80 which, with interest, is the amount plaintiff now seeks to recover.

The practically undisputed facts show that the government officials did everything which they were called upon to do. The government, in due course, sent the formal proposal blanks for signature to defendant, and there was nothing further which the government could do to assure strict technical compliance with the provisions of section 3744, R. S. In a spirit of helpfulness the government, as was its duty, did everything within its power to reduce the damage caused by defendant's default, and by the diversion of tonnage kept that damage down to a figure much below the figures of the then prevailing market.

Defendant now resists the claim of plaintiff on the ground that the failure of the contracting parties to sign the contract of transportation results in no contract or, as defendant puts it, in a void contract.

Defendant, to support this contention, relies on a line of cases in the United States Supreme Court and in the Court of Claims, beginning with Clark v. United States, 95 U. S. 539, 24 L. Ed. 518; South Boston Iron Co. v. United States, 118 U. S. 37, 6 Sup. Ct. 728, 30 L. Ed. 69; Monroe v. United States, 184 U. S. 524, 22 Sup. Ct. 444, 46 L. Ed. 670; Henderson v. United States, 4 Ct. Cl. 75; Danolds v. United States, 5 Ct. Cl. 65; McLaughlin v. United States, 37 Ct. Cl. 150; Johnston v. United States, 41 Ct. Cl. 76.

In all these cases a recovery was sought against the United States and recovery was denied. Some of the cases worked great hardship; notably the Clark Case, supra. But beginning with the Clark Case, the courts have construed this statute as one, the fundamental purpose of which is to protect the government against fraud and to obviate that uncertainty which frequently arises where a contract and its terms rest on parol evidence.

Defendant insists that the statute is a statute of frauds, and defendant points to the use of the word "void" in a number of decisions where the courts have said that the contract is void because of failure by the appropriate government officials to sign.

It happens not infrequently that the word "void" is used in other than its strict technical sense (Ewell v. Daggs, 108 U. S. 143, 2 Sup. Ct. 408, 27 L. Ed. 682); such use sometimes being due to the fact that the writer has in mind the ineffectual character of the transaction as relating to the party against whom recovery is sought.

There is, however, merely a surface value in words of technical meaning, and the inquiry should be as to whether, as matter of law,

the contract is void, and whether the courts intended in previous decisions that it should be so construed.

The title of the act and its structure clearly show its purpose.

It was enacted during the Civil War manifestly to protect the United States. As was said by Mr. Justice Bradley in the Clark Case:

"The facility with which the government may be pillaged by the presentment of claims of the most extraordinary character, if allowed to be sustained, by parol evidence, which can always be produced to any required extent, renders it highly desirable that all contracts which are made the basis of demands against the government should be in writing."

It will be noted that reference is made to "demands against the government," and in every opinion will be found some limiting language indicating the view of the courts that the statute was one for the protection of the government. In Henderson's Case, supra, the court said:

"The necessity and importance of such a provision *to the government* in preventing mistakes, imposition, and fraud, can scarcely be overestimated."

In the South Boston Iron Co. Case, supra, Mr. Chief Justice Waite, after referring to the fact that a contract in the form required by the statute was not executed, said:

"This was never done, and, therefore, the United States never became bound."

A statute which is designated as a statute of frauds, must declare the contract which is the subject-matter of the enactment, to be void, or the transaction with which it deals must be void as against public policy.

In the absence of either of these elements, a statute cannot properly be described as a statute of frauds.

It is, of course, well settled that, if a statute is a statute of frauds, it cannot be defeated merely because it may be availed of to perpetrate a moral fraud; but, before a statute may be characterized as a statute of frauds, it is desirable to ascertain its purpose, and thereby to determine whether such a construction safeguards against the mischief intended to be prevented.

If the statute here under consideration were to be construed as allowing the contractor to escape his engagements because he fails to sign as he has promised, then this statute might well be entitled "An act to promote fraud."

The government, in good faith and in reliance upon acceptance of terms of an advertisement or invitation, might, time and again, in the event of default, be subjected not merely to great financial loss, but to the graver results which might follow from not providing for the needs of the three important Departments of War, Navy, and Interior.

The contractor, on the other hand, can fully protect himself. It is well settled that public officers are presumed to do their duty, and it cannot be assumed that for captious or corrupt reasons the appropriate officials will, in a proper case, fail to sign a formal contract as required by the statute. If the transaction is still in the negoti-

atory period, the contractor is not called upon to do any act or expend any money until he holds in his hands the duly executed contract. On the other hand, if, as in this case, the contractor engages to do that which the government invites, and then, for one reason or another, declines to sign the formal contract which expresses what the parties have agreed to do, the door would be swung wide open for experimental or collusive bids and tenders, and the government would be at the mercy of bidders actuated either by corrupt motives or, as in this case, by the exigencies of the situation. If there were no such statute, the correspondence above referred to would constitute a binding and valid contract; but there is such a statute, and it steps in, not to relieve the contractor of his default, but to protect the government in a way which secures it against wrongdoing but which does not, in any manner, injure the contractor.

I am of the opinion, therefore, that the defendant was legally bound to furnish transportation as per its letter of November 13, 1909, and the telegram of acceptance on the same date, signed by the Paymaster General.

There remains only the question of damages.

[2] The contract having been entered into, defendant, by its own acts, constituted the government, in effect, its agent to arrange with Baker Transportation Company for the diversion of tonnage.

Defendant urges that it should be held liable only for the minimum of 8,000 tons; but the correspondence shows, and I suppose it is a matter practically of common knowledge, that vessels are not expected to carry tonnage to a precise amount, but to an amount fairly approximate.

[3] The correspondence between the Bureau and Baker Transportation Company was objected to as res inter alios acta. Had the defendant not requested the officials to obtain this diversion, if possible, that objection would, doubtless, have been sound. But, having made that request, plaintiff was entitled to show what it did in response to that request, and it showed that it had obtained a rate for diversion which inured considerably to the benefit of defendant.

Indeed, I may repeat that the officers of the Bureau did everything in their power promptly to secure this necessary coal at the least possible expense to defendant.

For the reasons stated, plaintiff is entitled to judgment for $9,679.-80, with interest.

Ordinarily the interest would run from December 25, 1909, the date of defendant's default; but I think that in this case it will be proper to calculate the interest from the date of payment by plaintiff to Baker Transportation Company.

As that date does not appear in the record, it probably may be arrived at by stipulation between the parties.