Casey, Oh. J.,
delivered the opinion of the court.
The claimant brings this suit to recover the sum of $7,253 90. This claim is based upon an alleged verbal agreement made by claimant with Captain William Mills, an assistant quartermaster, on duty with the army under General Thomas in the department of the Cumberland.
On the 31st December, 1864, the chief quartermaster of the department issued to Captain Mills the following order:
Captain: The matter of supplying this department with Avood is intrusted to your discretion and j udgment. I am satisfied from your report of December 30th, that great frauds have been committed on the government in this matter, and to you are in *79 trusted tbe steps necessary to put an end to tliem. By a proper system of checks amongst your employes, I have no doubt you will be able to effect it, and I confidently count on your doing it. Arrest and try by court-martial one or two contractors or dishonest agents, and my word for it you will have no trouble afterwards.
Very respectfully,
J. L. DONALDSON,

Brevet Brig. Gen. and Chief Q. M. Dept. Cumberland.

This order was accompanied by a-letter from Gen. Donaldson informing Captain Mills of the orders given to the officers in charge of transportation in reference to the conveyance of the fuel to Nashville. It contained this further direction:
“I desire you to provide and keep on hand here not less than 2,000 cords of wood in addition to-your regular issues, and you are authorized to increase your force of employés as it becomes necessary.”
After the receipt of these orders Captain Mills entered into a verbal contract with the claimant, to cut and furnish 3,000 cords of wood. It was to be delivered on the bank of the Cumberland river, some thirty miles distant from Nashville, at $6 per cord. The claimant, in pursuance of this alleged contract, had cut and deposited at the appointed place about 2,000 cords of wood. Of this quantity 1,414 cords were taken away and paid for by the United States. The first delivery was made on the 20th February, 1865, and the last occurred on the 8th day of May following. The evidence does not fix the precise date of the verbal agreement between Captain Mills and the claimant, but it was some time in the early part of January, A. D. 1865. Nor does it show what became of the wood that was not received and paid for by Captain Mills. It is to 'recover the price of the 1,486 cords at $6 per cord that this action is brought.
To this claim the United States interpose the defence—
1st. That the contract is not in writing as is required by the first section of the act of Congress approved June 2,1862. — (12 Stat. L., 411; 2 Bright. Dig., 9, pi. 3.)
2d. That there was no advertisement for proposals for the fuel, and no such orders from competent military authority as would dispense with the requirement of the law as is provided by the act of Congress a£>proved July 4, 1864. — (13 Stat., 381, 2 Bright. Dig., p. 15, pi. 41, 42, 43.)
*80 I. The act of 1862 is entitled “An act to prevent and punish fraud on the part of officers intrusted with making contracts for the government.” One of the means by which this law proposes to prevent and punish frauds is the requirement that the contract shall be reduced to writing, and should be signed by the officer making it as well as by the contractor or contractors. The words of the statute are that •“ It shall be the duty of the Secretary of War, of the Secretary of the Navy, and of the Secretary of the Interior, immediately after the passage of this act, to cause and require every contract made by them severally on behalf of the government, or by their officers under them appointed to make such contracts, to be reduced to writing and signed by the contracting parties, with their names at the end thereof.” The officer making such contract is required to make a return to the “Returns office” of a copy of such contract, together with all the offers or bids made to him, the advertisement published by him inviting proposals, attaching them all together, and adding thereto an affidavit of the accuracy of the copy of the contract that he has no interest or benefit in it, and that no advantage or benefit was, corruptly allowed in it to any other person, and that the papers annexed include all relating to such contract. For false swearing in the matter the officer is to be liable to all the pains and penalties by law inflicted on wilful and corrupt perjury. Failing to make the required affidavit and return, unless prevented by unavoidable accident, the officer shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine not less than one hundrd nor more than five hundred dollars, and be imprisoned for not more than six months, at .the discretion of the court trying the offence. By the 5th section of the same act, it is made the duty of the Secretaries of War, tlie Navy, and the Interior, immediately after the passage of the act, to furnish each and every officer severally appointed by them with authority to make contracts, with printed instructions, setting forth the duties of such officer under this act, and also to furnish them with forms, printed in blank, of contracts to be made, and the affidavit of returns required to be affixed thereto, &c. On' the 17th July, 1862, Congress passed another statute, the 13th section of which required “All contracts made for, or orders given for the purchase of, goods or supplies by any department of the government, shall be promptly reported to Congress by *81 the proper head of such department if Congress shall at the time be in session,* and if not in session, said'reports shall be made at the commencement of the next ensuing session.
The question now arises, does the failure to reduce the contract to writing, and to have it returned, with the accompanying papers and the affidavit of the officer who made it, to the “Returns office,” affect its validity*? Is a verbal executory contract made by an officer of the War, Navy, or Interior Department, since the above-recited act, binding upon the United States ? Is the provision requiring it to be reduced to writing directory or. mandatory — discretionary or imperative ? I feel quite clear in saying that a contract reduced to writing and executed with all the formalities and solemnity the law requires, will not be invalidated by the failure of the officer to make his proper return of the same. That is made his exclusive duty by the law, and he alone is to be punished for it by the stringent and severe penalties prescribed by the act. But it will be observed that all the penalties are prescribed for omissions'and commissions which exclusively pertain to the separate duties of the officer. There is no express penalty inflicted for a failure to reduce the contract to writing. But the law having required that such contracts shall be so reduced to writing, makes it as much the duty of the contractor as of the officer to see that this requirement is fulfilled. These officers, and especially the subordinate officers of these departments, are only the special agents of the United States. They possess no general undefined powersj but a special, limited, and restricted authority. Their duties are prescribed by law, and their right to bind the United States bounded and circumscribed by the special authority expressly conferred or necessarily implied as essential to the performance of a duty imposed. The words of the statute are positive and peremptory. The Secretaries of War, Navy, and Interior shall cause and require every contract made by themselves or their subordinates to be reduced to writing and signed by both parties. The necessity and importance 0f Such a provision to the government, in preventing mistake, imposition, and fraud, can scarcely be over-estimated. The objects of the various provisions of .law upon this subject are to secure, as far as possible, uniformity in the several grades and classes of contracts, supervision and control of the entire range of contracts made for and on behalf of any one of the departments named, by the. head of it. The *82 necessity, too, of baying full and accurate knowledge in advance of wbat supplies are contracted for, and wbat obligations are to be met by tbe department. Then tbe act of July 17,1862, requires all sucb orders given,, or supplies contracted for, shall be promptly reported to Congress if in session when tbe contracts are made or tbe orders given, and if not so in session, then at tbe commencement of tbe next ensuing session. Now, it would be utterly impossible for tbe bead of a department to exercise that care and supervision wbicb tbe law contemplates and requires of bim over tbe business affairs, tbe engagements and contracts of bis department, unless tbey all be reduced to writing. Nor could be furnisb to Congress tbe full and specific information tbe law requires bim to give, unless be follows out tbe direction of tbe law and requires all bis subordinates to do tbe same thing. Besidesthis, Congress, by an act passed onthel7th July, 1862, provided “ that tbe operation of tbe act entitled ‘An act to prevent and punish frauds on tbe part of officers intrusted with making contracts for tbe government,’ approved June two, eighteen hundred and sixty-two, be and tbe same is hereby suspended until tbe first Monday of January, 1863.” If tbe enactment bad been regarded by Congress as merely directory, no sucb law would have been passed; but it is evident from these subsequent enactments, as well as from tbe language of tbe law itself and tbe purpose of its enactment, that Congress deemed it essential in its character and mandatory in its requirements. If this requisite so explicitly and expressly commanded may be dispensed with as a mere direction, without being obligatory in one case, it may in all cases. If one executory contract need not be in writing, all may be verbal or informal. All tbe vast affairs of this great nation, embracing tbe annual expenditure of many millions of treasure, may rest in tbe frail memory of a few officers or parties to tbe contracts. In tbe uncertainty and confusion that must ensue from sucb a state of things, all attempts to estimate tbe obligations of tbe government, even approximately, would be impossible. Instead of preventing fraud, it would be promoted. Instead of securing healthy and just accountability and responsibility in subordinates, we have confusion and insubordination, and instead of fidelity and honesty in public agents, we shall have corruption and peculation stalking abroad undetected and unpunished. There is and can be no hardship in requiring every one dealing with an officer or *83 agent of the United States to take notice of the provisions of a public statute enacted upon the subject. It is the business of every one so dealing to see that the public agent with whom he is negotiating is acting within the scope of Ms powers. If the transactions were with a private agent he would be bound to do so, and there is no reason why the rule should be relaxed in relation to public officers. But, on the contrary, every consideration of public convenience, policy, and morality require that it should be strictly adhered to and enforced.
I cannot consider this provision in the act of 1862 as merely directory. A matter of such great public importance was never intended to be left to the discretion of those whose conduct it was intended to control and regulate. It is true that there are no negative words in this part of the statute. No provision is . inserted that verbal contracts shall be null and void. Nor do I apprehend that such words or such a clause was necessary to make it imperative. • “ Where affirmative words used are peremptory, the provision cannot be held as directory.” (Davison v. Gill, 1 East., 64.) If affirmative words are absolute, explicit, and peremptory, and show that no discretion is intended to be given, it will be held imperative. (2 Inst., 388; Dwarris on Stat. L., 611.) And Lord Mansfield says there is a known distinction between circumstances which are of the essence of a thing required to be done by an act of Parliament and clauses merely directory. (Rex v. Loxdale, 1 Burr. 447.) Even words which are not imperative, in their ordinary signification, shall be held obligatory in a statute directing a thing to be done for public justice or for the public benefit. In such case “may” will be construed as “shall,” and “it shall be lawful,” as a peremptory enactment. (Rex v. Blackwold, &c., 2 Chitty, 251; Rex v. Barlow, Salk., 609, Vern. 154; Supervisors v. United States, 4 Wall., 435; City of Galena v. Amy, 5 Wall., 705; Malcom v. Rogers, 5 Cow., 188; Mayor v. Furze, 3 Hill, 612.)
In looking at the scope and purpose of this law, and at the words in which it is couched, I cannot doubt of the intention of Congress in its enactment. To my mind it is quite clear that it was designed to require every executory contract, at least, to be put in writing, so that its terms might not be mistaken; that the character and -extent of the outstanding engagements and obligations of the United States might at all times be known to the executive and legislative departments, or be capa *84 ble of being ascertained in a reasonable time and with approximate exactitude. We can readily conceive of a condition of public affairs — of a great crisis in our national concerns — when such knowledge would be essential to measures of publie benefit or safety. Without some system of the kind it is very evident that the utmost fidelity and vigilance on the part of the chief executive officers, and by Congress, would be unavailing to detect or prevent collusion, corruption and fraud on the part of contractors and subordinate officers. For these reasons we hold this statute to be mandatory and imperative in its requirements, and that because they have not been followed in this case, this contract cannot be enforced.
These views do not in the least conflict with our decision in the case of Charles H. Adams, 1 N. and H., 192. In that case the contract was in writing and signed by the parties. The only question was in regard to its verification and return to the returns office. These latter things we held to be mandatory on the officers alone who made the contract; and their omission by him, while it made him amenable to the penalties prescribed by the act, did not invalidate the contract itself. They were to be the acts of the officer alone, after the contract should be executed and completed, and over which the other party could exercise no control, and for which he ought not in any way be held responsible. To these views we adhere, and only hold the contract to be unavailable because it was not reduced to writing.
II. The act of July 4,1864, in its 4th section pro1vides: “When an emergency shall exist requiring the immediate procurement of supplies for the necessary movements and operations of an army or detachment,, and when such supplies cannot be procured from any established depot of quartermasters’ department, or from the head of the division charged with the duty of furnishing such supplies within the required time, then it shall be lawful for the commanding officer of such army or detachment to order the chief quartermaster of such army or detachment to procure such supplies during the cpntinuance of such emergency, hut no longer, In the most expeditious manner, and without advertisement; and it shall be the duty of such quartermaster tó obey such order; and his accounts of the disbursement of moneys for such supplies shall be accompanied by the order of the commanding officer as aforesaid, or a certified copy of the same; and also by a statement of the particular *85 facts and .circumstances, with their ■ dates, constituting such emergency.” (See 12 Stat. L., p. 600.)
This act disposes, in a very clear and satisfactory manner, of the question which caused a great deal of discussion in the Frémont cases. (2 C. Cls. R., p. 1 to 103.) Prior to its passage various laws had enacted that “When immediate delivery or performance is required by the public exigency, the articles or service required may be procured by open purchase or contract, at the places and in the manner in which such articles are usually bought and sold, or such services engaged between individuals.” (Act March 2,1861, § 10,12 Stat. L., 220; 2 Bright. Dig., p. 93, pi. 2.) But these prior laws had not defined the right and power of any officer to declare the existence of the exigency; and this fact gave rise to great variety of opinion, both at the •bar and among the judges who ruled those cases.
This act of 1864, above recited, completes the system, and makes all the laws harmonious and effective. It leaves the question of whether the emergency does or does not exist with the commanding officer of the army or detachment for which the services or supplies are required. His orders in the premises are made conclusive upon the officers charged with obtaining these supplies or services, that the exigency exists; and probably, also, upon all other departments and tribunals' of the government. Without this order from the commanding general of the army or detachment to be supplied, the quartermasters would have no power or authority to procure supplies in any other method than that pointed out by the acts of Congress; that is, by advertisements, proposals, and written contracts.
Applying these deductions from the plain and positive enactments of Congress to the case in hand, it will be found that this contract is ivanting in the requisites to give it vitality and validity as against the Dnited States. Nor do we, in so deciding, depart from the doctrine heretofore held in cases occurring before the passage of these laws. Those decisions were based upon the fact that the law had designated no person and prescribed no mode of declaring and defining the exigency; and that, therefore, when the general in command of the department and the officers intrusted with the making of contracts and procuring supplies had declared an exigency or acted upon the existence of it, the party furnishing the supplies or entering into the contract might regard their decision as correct, *86 and was not bound to know or to inquire further whether such exigency did or did not actually exist; and their action would be upheld, unless it was proved that the emergency was not real, or that the transaction was not one of good faith, or justified by the attendant facts and circumstances. (Stevens v. United States, 2 C. Cls. R., p. 101; Floyd v. United States, 2 id., 429.)
The contractor was not bound, under the old law, to know the facts. But, under this law, he is bound to inquire and to know whether the proper commanding officer has declared the exigency and authorized the officer making the contract to dispense with the usual safeguards which the laws of Congress have thrown around the operations and engagements of subordinate officers and agents. It is a fact easily ascertained. And as it furnishes the very foundation and authority of a subordi-* nate officer to make contracts or purchases in a particular manner, there is no hardship in requiring persons dealing with such officer to first ascertain whether he has the requisite legal authority to enter into the proposed stipulations and obligations for the United States. So much is required of all persons dealing with an agent. Whenever a bargain or transaction out of the ordinary usages of trade is proposed by an agent or factor, the first duty of the other party is to satisfy himself that the agent has authority from his principal to enter into the proposed stipulations. If he fail to do so, he takes all the risk of the agent’s authority upon himself. There is every reason, where the law has prescribed definitely and precisely, as here, the evidence of the public agent’s power and authority, to apply the same rule. Does a quartermaster propose to contract or order supplies verbally, without advertisements or bids, the party proposing to enter into the contract may then inquire whether an exigency exists ? and if so, for the orders of the commanding, general declaring it and ordering the supplies to be procured in the extraordinary manner proposed.
The transactions in this case occurred after the passage of these laws. They were subject to their provisions, but they do not conform, in any manner, to their requirements. The commanding general did not declare this exigency. Neither General Donaldson, the chief quartermaster of the department, nor any of his subordinates, had any right to do so. There was no authority for the making of this' verbal agreement *87 in. tbe manner detailed in tbe evidence; and it is, therefore, not binding- on tbe United States.
We enter judgment that tbe petition be dismissed.