Campbell, Chief Justice,
delivered the opinion of the court:
The first question presented for our consideration is that of reformation of the contract set out in the petition.
The right to reform a written instrument so as to make it speak the intention of the parties when by a mutual mistake of the parties the terms of the agreement between them are not correctly expressed in the instrument as written is unquestioned.
The reformation of written contracts for fraud or mistake is an ordinary head of equity jurisdiction. The rules which govern the exercise of this power are founded in good sense and are well settled. Where the agreement as reduced to writing omits or contains terms or stipulations contrary to the common intention of the parties the instrument will be corrected so as to make it conform to their real intent. The parties will be placed as they would have stood if the mistake had not occurred. Hearne v. Marine Ins. Co., 20 Wall., 411, 490; Simmons Creek Co. v. Doran, 142 U. S., 417. And this court has jurisdiction under the statute to reform instruments as courts of equity may. United States v. Milliken Imprinting Co., 202 U. S., 168.
Where the relief is sought upon the ground of mistake alone, there being no fraud or inequitable conduct alleged or relied upon, the mistake must be mutual and not merely the mistake of one of the parties. “ It must# appear that both have done what neither intended. A mistake on one side may be ground for rescinding, but not for reforming, a contract. Where the minds of the parties have not met there is no contract, and hence none to be rectified.” Hearne v. Marine Ins. Co., supra; Moffett v. Rochester, 178 U. S., 373; Lyman v. U. S. Ins. Co., 17 Johns, 377.
For, as was expressed by Chief Justice Ames in Diman v. Providence Co., 5 R. I., 130: “ If the court were to reform *644 the writing to make it accord with the intent of one party only to the agreement, who avers and proves that he signed it as it was written by mistake, when it accurately expressed the agreement as understood by the other party, the writing, when so allowed, would be just as far from expressing the agreement as it was before, and the court would be engaged in the singular office of doing right to one of the parties at the cost of a precisely equal wrong to the other.”
In Christopher v. 23d St. Ry. Co., 149 N. Y., 51; 43 N. E. R., 538, the same idea is expressed, as follows: “If it was such a contract as one of the parties intended to make and the one it understood the others also intended to make, the court had no power to reform it, Paine v. Jones, 75 N. Y., 593, as under such circumstances it would be making a new contract for the parties and unjust to the ones who made no mistake,” citing Nevins v. Dunlop, 33 N. Y., 676, Lymam, v. Ins. Co., 17 Johns., 373. And to the same effect is Greene v. Stone, 54 N. J. Eq., 387; 55 Am. St. R., 387, where it is said: “ Beatification can only be had where both parties have executed an instrument under a common mistake and have done what neither of them intended. A mistake on one side may be ground for rescinding, but not for correcting or rectifying, an agreement.” See also 34 Cyc. Title Reformation, 915; 1 Story Eq. Juris., sec. 151.
Where a contract has been executed there is a strong presumption to be indulged that it correctly expreses the intention of the parties, and this presumption is not easily removed. The burden of proof is upon the party seeking the reformation. Mr. Pomeroy says that courts of equity do not grant the high remedy of reformation upon a probability nor even upon a mere preponderance of evidence, but only upon the certainty of error. 2 Pom. Eq. Juris., 3d ed., sec. 859; Lyman v. U. S. Ins. Co., 2 Johns Chy., 632. Mr. Justice Strong, in the opinion in the Atlantic Delaine Co. v. James, 94 U. S., 207, declared that “ canceling an executory contract is an exertion of the most extraordinary power of a court of equity ” and the reformation of one for an alleged mistake is to be approached with a due regard for the grav *645 ity of the result. The general doctrine, as stated by Mr. Justice Miller in Maxwell Land-Grant case, 121 U. S., 325, is that the testimony on which a court of equity will reform a written instrument must be clear, unequivocal, and convincing, and that it can not be done on a mere preponderance of the evidence.
And a proposition sustained by the authorities is that the evidence of mutuality of mistake must relate to the time of the execution of the instrument and show that at that particular time both parties intended to say a certain thing and by mistake expressed another thing. 34 Cyc., 919.
Before proceeding to an application of these principles to the facts we deem it proper to say that the statements which have been referred to come into this case through “ calls ” made by this court upon the Secretary of the Navy under the terms of sec. 1076, Revised Statutes, and this court has held on several occasions that the “ replies ” which are made to these “ calls,” whatever may be their terms, can not admit away or waive any valid defense of the United States to a claim, Leonard's ease, 18 C. Cls., 385. While admitting official reports and correspondence of public officers in the line of their duty as evidence, the court said in the Waters' ease, 4 C. Cls., 389, 391, “ But it is not the business of a public officer to make admissions against the Government, nor can any such admissions bind the defendants.” And as was said in the Allen ease, 28 C. Cls., 146, “ Where a case is tried on its merits the testimony is confined to the record evidence, the oral statements of witnesses in court or their depositions taken upon notice in accordance with the statute and the rules of the court.” See also Whiteside's case, 93 U. S., 247. We are constrained to cite these cases because in the present case no deposition of any witness is taken, and we do not wish to establish a precedent in this case different from the settled practice of the court. But as the parties have submitted the cause without objection to the form or competency of the testimony, we shall in this case proceed to consider it.
The defendants, while they do not deny the general power of a court of equity to re-form instruments, insist, in the first *646 place, that the instrument in question can not be re-formed because of section 3744, Revised Statutes, which makes it the duty of the Secretary of War, of the Secretary of the Navy, and of the Secretary of the Interior—
“ to cause and require every contract made by them, severally, on behalf of the Government, and by their officers under them, appointed to make such contracts, to be reduced to writing and signed by the contracting parties with their names at the end thereof.”
The construction given this statute and the sections of the Revised Statutes, immediately following, is that oral agreements, made by any of said officers, are absolutely void until reduced to writing and signed as directed by the statute, or, as stated by the Supreme Court in Clark v. United States, 95 U. S., 539: “It makes it unlawful for contracting officers to make contracts in any other way than by writing signed by the parties. This is equivalent to prohibiting any other mode of making contracts.” And, as it is well established that “the United States, as a body politic, act only by public officers who are special agents intrusted with specific defined duties, and who can bind the Government only to the extent of the authority conferred upon them,” McCullom's case, 17 C. Cls., 92, it is argued that the written instrument, as signed by the parties, is the expositor of their contract and that preliminary oral agreements, being void by the terms of the statute, can not be considered in order to re-form the written instrument. It is true that said statute, secs. 3744 et seq., Rev. Stat., not only requires the contracts of said Government agents to be in writing and signed by them, but also provides heavy penalties against the agents who violate it, and it is frequently referred to in the decisions as a statute to prevent frauds and perjuries. Its title was “An act to prevent and punish fraud on the part of officers intrusted with making of contracts for the Government.” 12 Stat. L., 411. See Danold's case, 5 C. Cls., 65; Lindsley's case, 4 Ib. 359. But it also is true that the statute of frauds, as it is known to the courts in the several States of the Union, has been uniformly construed as not preventive of the exercise by a court of equity of its *647 jurisdiction to re-form written instruments as evidence of contracts, required by said statutes to be in writing. But it may be added that said section 3744 is perhaps stricter than the “ statute of frauds ” in that part performance is not sufficient to authorize the enforcement of a contract which is not executed as it prescribes. St. Louis Grain & Hay Co. case, 37 C. Cls., 281.
And while, as pointed out in the argument, the statute refers by name to only three of the departments and pronounces heavy penalties for its violation, we are not prepared to go to the extent of holding that, where a written contract is made by the officials referred to in the statute and by mutual mistake it fails to express the intention of the parties, the party injured by the mistake is without remedy. We do think, however, that the purpose and policy of said statute should have some effect in this case, not as necessarily forbidding the re-formation of an instrument, if it should, under the facts, be re-formed, but as emphasizing the care and diligence which parties entering into written contracts with agents of the Government should observe.
“ Every man is supposed to know the law. A party who makes a contract with an officer, without having it reduced to writing, is knowingly accessory to a violation of duty on his part. Such a party aids in the violation of the law.” Clark's case, 95 U. S., 539. It may therefore be said that a party is enjoined by the statute, or at least by the policy of it, to observe that the agreement he makes is correctly expressed in the contract which he signs. For to allow carelessness to take the place of care, to admit inattention where prudence is proper and thus to excuse a party from the obligations of contracts which must be “ in writing and signed by the contracting parties ” may tend to an infraction of the salutary policy of the statute in question; because if the remedy be made too easy an invitation to make mistakes may be extended. It may be added, however, that there is nothing in the case before us which impeaches the good faith of the parties concerned in the alleged mistake.
Applying the principles of law above stated to the facts of the case as they appear above, does the claimant show a *648 case of mutual mistake justifying the re-formation of the instrument in question?
The Navy Department was in urgent need of coal in the Philippine Islands. Before this urgency developed it is apparent that certain specifications had been provided looking to the transportation of the coal by a number of parties, and these specifications included the clause which is the subject of this controversy, and the clause itself is characterized in the above statement by the acting chief of bureau as an “unusual” clause. The Bureau of Equipment was the agency of the Navy Department which was vested with the power to negotiate for the transportation of the coal, and entered into negotiations with the claimant’s decedent. Its powers and the sphere of its operations were well defined by the Navy regulations, and of these the claimant must be held to have had notice. Nothing is better settled than the doctrine that one who deals with a Government official is bound to know the extent of his authority. “ It is the business of everyone so dealing to see that the public agent with whom he is negotiating is acting within the scope of his powers. If the transactions were with a private agent he would be bound to do so, and there is no reason why the rule should be relaxed in relation to public officers; but, on the contrary, every consideration of public convenience, policy, and morality requires that it should be strictly adhered to and enforced.” Henderson’s case, 4 C. Cls., 75; Hawkins's case, 96 U. S., 689. The form of specifications which it was contemplated the Government would incorporate in the contract for transporting the coal was examined by the claimant’s decedent, and he objected to the clause in question. The agent of the Bureau of Equipment who was dealing with claimant’s decedent agreed with claimant’s decedent that the objectionable clause would be eliminated from the specifications, and the other terms were settled between them. If the Bureau of Equipment had possessed the authority to make a contract with claimant’s decedent binding upon the United States, its dealings with claimant’s decedent would not have amounted to a contract, because until reduced to writing and signed by the contracting parties it was void by *649 the terms of the statute, section 3744. Clark's case, supra. But that bureau had not the authority to make a contract. At most it could enter into negotiations forming the basis of a contract which could be made under the auspices of another bureau. The claimant’s decedent not only knew that his negotiations with the Bureau of Equipment were worthless until a written contract was made, but he also knew that the contract could only be made through the Paymaster General’s Office or by the Secretary “of the Navy, it being so designated in the Navy regulations in conformity to statute.
The specifications were included in a requisition made by the Bureau of Equipment, and by a “ clerical inadvertence ” (we are told) the said clause was not stricken from the specifications, and the requisition carrying the objectionable clause went forward to the proper officer and ultimately reached the Bureau of Supplies ánd Accounts. Up to this point there was nothing binding upon the defendants, and a contract was to be made which, though it included the specifications referred to, contained stipulations binding the claimant’s decedent and the United States alike to grave responsibilities and obligations, respectively. It was accordingly prepared under instructions from the Paymaster General’s office by Pay Director Boggs in duplicate. It included the said specifications as shown in the requisition. Neither the Bureau of Supplies and Accounts nor the official who prepared the contract had any knowledge of any negotiations between the Bureau of Equipment, or an agent thereof, and the claimant’s decedent further than was given by the requisition. And here again we may advert to section 3744, Revised Statutes.
Its requirements, as the courts have repeatedly held, are mandatory. “ The necessity and importance of such a provision to the Government in preventing mistake, imposition, and fraud can scarcely be overestimated.” Henderson's case, 4 C. Cls., 75. “The facility with which the Government may be pillaged by the presentment of claims of the most extraordinary character if allowed to be sustained by parol evidence, which can always be produced to any re *650 quired extent, renders it highly desirable that all contracts which are made the basis of demands against the Government should be in writing.” Per Mr. Justice Bradley in Clark v. United States, 95 U. S., 539. The purpose of the statute is not only to prevent frauds and perjuries, but also to secure certainty and definiteness in the contracts which may be made on behalf of the Government; and these, in the very nature of things, can not be secured where they are left to depend upon parol testimony.
And so mandatory is the statute that the contract shall be in writing and signed by the parties that the preliminary agreement of the parties has no force until a contract in conformity to the statute is executed. The agreement between the Bureau of Equipment and claimant’s decedent as to the clause in question, as well as to all the specifications, were mere negotiations, or “preliminary memoranda made by the parties for use in preparing a contract for execution in the form required by law.” South Boston Iron Co. case, 118 U. S., 37; Clark's case, 95 U. S., 539. “The preliminary advertisements, specifications, and proposals, and acceptance of proposals must be viewed as becoming a part of the statutory contract when a contract was executed as required by statute, but until then only a part of the negotiations looking to a formal contract.” McLaughlin's case, 36 C. Cls., 138, 177.
“It is the final written instrument that the statute contemplates shall be executed and signed by the parties and which shall contain and be the proof of their obligations and rights.” Monroe v. United States, 184 U. S., 524.
The claimant’s decedent was thus informed, by the terms of the statute, that he must have a written contract signed by some duly authorized agent of the United States. This agent, by the terms of the statute, was either the Secretary of the Navy or some agency designated by him. Under the Navy Begulations then in force that power was vested in the Paymaster General’s office, and hence we find the contract was executed on behalf of the defendants by Pay Director Boggs under instructions from his superior, and when signed by him and the claimant’s decedent it became the *651 contract of the United States. That said pay director signed the contract, as he understood and intended it should be, we have no doubt. With the requisition before him containing the specifications, including the said clause; with the intentional incorporation of the terms of the requisition itself into a separate instrument which would evidence the contract; with his instructions to execute that contract for the United States; with the transmission of that contract so written to the claimant’s decedent, and with its execution by Mr. Boggs and the claimant’s decedent, we can not escape the conclusion that there was no mistake in the execution of the instrument so far as the Bureau of Supplies and Accounts or the said pay director were concerned, and therefore none so far as the defendants here are concerned.
Nor did the subsequent action of the two bureaus in June, some months after the execution of the contract, in directing that said clause be ignored or eliminated, affect the question of their intention when the instrument was executed. When the Bureau of Equipment learned — probably from the letter of the commander at Cavite — that a difference appeared between his copy of instructions and charter parties held by the ships then arriving — that the said clause was in the contract, it referred the matter to the Bureau of Supplies and Accounts with a request that said clause be eliminated, which in turn referred it to the office of the Paymaster General, and from that official an order emanated to Pay Director Boggs authorizing an amendment of the contract in the particular requested. Thereupon Mr. Boggs addressed a communication to claimant’s decedent under date of June 23, notifying him that by direction of the Bureau of Supplies and Accounts the “ said contract is hereby amended ” by the omission of the clause stated and requested an acknowledgment as to “whether or not the amendment as above is satisfactory to you.” No reply to this communication appears in the record. The action of the bureaus and of the pay director did not have the effect of reforming the contract. Sec. 3744, R. S.; Jones's case, 11. C. Cls., 733; 96 U. S., 24; Wilson's case, 23 C. Cls. 77. The statute authorizes the Secretary of the Navy to designate parties *652 who can execute contracts, but when he has made the designation as in this case it does not follow that those authorized to execute may thereafter change the terms of the contract. It will be borne in mind that section 3747 requires sworn copies of the contract as executed to be made and deposited, and as no authority is given by the Secretary to those empowered to execute to modify a contract after its execution the right to do so does not exist. And this is evidently the view of claimant, because he would not be seeking a reformation of the contract if it had been already lawfully modified.
But claimant does insist that the action of the bureaus and of Pay Director Boggs should be considered as evidence of the fact that a mistake was made. And so it may be considered as a realization of the fact of a mistake by the Bureau of Equipment, where it is claimed the mistake originated, but it is not and can not be taken to prove that the party who signed the contract for the United States made a mistake when he executed the identical contract which it was his intention and which he understood should be executed. It will be borne in mind that until the matter was called to their attention in June neither the Bureau of Supplies and Accounts nor Pay Director Boggs had any knowledge of the claim that said clause should not occur in the written contract, and therefore their action at that time throws no light on the intention with which the contract was signed nor relate to the time of the execution of the instrument. As above suggested, the proof of the mutual mistake, which is relied on to reform a written instrument, must refer to a mistake which both parties made when they executed it, and therefore to an agreement between them before it was reduced to writing which is not correctly expressed in the writing.
“ It is essential that the extent of the rectification should be clearly ascertained and defined by evidence contemporaneous with or anterior to the contract.” Citizens National Bank v. Judy, 146 Ind., 342.
“ The rule of law that a mistake under consideration to be susceptible of correction must be mutual does not mean that both parties must agree on the hearing that a mistake was *653 in fact made, but that the evidence of mutuality in the mistake should relate to the time of the execution of the instrument, and show that at that particular time the parties intended to say a certain thing and by mistake of fact expressed another.” Mathews v. Whitethorne, 200 Ill., 36; 34 Cyc., 919.
In other words, what a party might have done if he had possessed knowledge which in fact he did not possess at the time of the transaction does not prove what he intended to do on a prior occasion when he did not possess such knowledge. Nor can we assent to the proposition that the Bureau of Supplies and Accounts acted mechanically under the direction of the Bureau of Equipment. The two bureaus are made distinct by statute and their respective spheres of power are defined by the Navy Regulations. To the one is given the right and power of binding the Government by contract and to the other no such right or power is given. The statute, sec. 3744, implies that the Secretary of the Navy may authorize another than himself to sign contracts, and he has designated such persons. It can not be therefore that the bureau in which is lodged the important power of obligating the United States by the terms of written contracts is directed by another bureau which is denied the power to contract.
It is insisted, however, by claimant that both of said bureaus were agencies of the Secretary of the Navy and that the act of one in agreeing with him on the specifications was the act of the Secretary, and that the act of the other in executing the contract was also his act, or, as counsel states it, that these two bureaus were in said transaction, respectively, “ the brain and the hand ” of the Secretary, and therefore that the mistake was his mistake throughout the transaction. It is true that the business of the Department of the Navy is distributed among bureaus in such maimer as the Secretary “shall judge to be expedient and proper,” sec. 419, Rev. Stat.; that their duties are performed under his authority, and that “their orders shall be considered as emanating from him.” Sec. 420, Rev. Stat. But this is not to say that a bureau may bind him when it acts beyond the scope of the. power given it, or because two bureaus, each *654 acting in its own sphere, engage at different times in different features of a given transaction, that therefore the several actions become blended into one transaction of the Secretary. On the contrary, the manifest purpose of the said statutes is to distribute the powers and responsibilities of administration among several bureaus with such limitations upon each and such grants to each as the Secretary may determine to be “ expedient and proper,” and if, as in this case, the mistake of one bureau is treated as the mistake of another and both mistakes as that of the Secretary, then there is no check upon either, and the bestowal of a power upon one bureau is equivalent to a grant of the same power to another regardless of any distribution of the business of the department which the Secretary may have made. Confessedly the Secretary did not have any actual knowledge of the transaction in question, nor can knowledge of it be imputed to him by proof that one of the bureaus made a mistake in the transaction; and if it could be imputed to him that fact would not make the act of another bureau in executing the contract mentioned with claimant’s decedent a mutual mistake of the parties to the contract. The contract was not that of the Secretary, but was the contract of the United States, though executed by an agent authorized by the Secretary to do so.
There is yet another view which may be considered. The claimant’s decedent was not examined as a witness, but the petition alleges that he signed the contract without reading it. The clause in question was of so grave importance that he strenuously objected to its incorporation into the contract when he had the preliminary negotiations with the Bureau of Equipment. He insisted it should be omitted and, because of his objections and the urgency of securing transportation of the coal to Manila Bay, said bureau agreed it should be omitted, and here, so far as claimant is concerned, the question is allowed to rest. He knew a contract was to be “reduced to writing and signed” by another bureau or an agent duly authorized and by himself. He knew one was drawn by that other bureau and sent to him in duplicate, and he signed it as written, containing the clause which he *655 was, at first, so insistent it should not contain, and he did so without reading it. The contract was an important one, involving many thousands of dollars to the United States and grave responsibilities and engagements on his part. It contained a clause which to him was very objectionable in his negotiations and one that he insisted should be stricken from the specifications, and one which he yet regards as very important, and the only excuse offered (for he does not testify) is that he did not read the contract before signing it, though it was in duplicate, and presumably he kept a copy. Refusal to re-form a written instrument for mistake has been based by the courts on a want of care of the complaining party where the circumstances are not stronger than those which characterized claimant’s conduct.
In this connection the claimant relies upon the Snell ease, 98 U. S., 85. There the complainants’ agent had effected insurance to cover their interest in certain cotton, but the insurance, as written, was in the agent’s name alone. The court found that a valid contract had been made between the parties and that the agents of the insurance company intended to insure and by direct statements induced complainants’ agent to believe that they were giving insurance in his name upon the interest of complainants (his principal) , and the agent assented to the insurance being taken in his name because of the distinct representation and agreement that the interest of the complainants in the cotton which was insured would be protected by the policy. It appears also that the policy was not delivered to Keith, the agent of complainants, but was retained for him by the insurance agents, nor did he see it until after the loss covered by it had occurred. Immediately upon being advised by his attorney that the policy as written did not protect the interest of the complainants, Keith, their agent, promptly avowed the mistake and asked that the policy be corrected in conformity with the original agreement. The court says that Keith relied upon the representations of the insurance agents as to the effect of the policy and not unreasonably relied upon their larger experience and greater knowledge in matters concerning the proper mode of consummating by writ *656 ten agreement the contract according to the understanding of. the parties, and trusted them to prepare the written agreement. '
We think, however, that the said case is not controlling here. There both parties — or the agents of both, who acted for them — understood at the time the written contract was made that the policy was intended to cover the interest of complainants in the cotton, and the complainants’ agent, in reliance upon the representations of the insurance agents that it did so cover that interest left the policy in their possession and did not see it until after the loss, when he promptly, avowed the mistake. The court emphasizes the fact that as soon as he received the policy, consulted counsel, and ascertained the mistake, the agent insisted upon its correction. In the present case there was no representation of the meaning of terms in the contract different from their real meaning, and if it be conceded for argument’s sake that the claimant shows that the Bureau of Equipment agreed that a certain clause appearing in the form of specifications would not be included in the written contract, that another clause should take its place, and that the claimant’s decedent had a right to rely upon that bureau, it would still appear that the Snell case would not apply, for after the alleged agreement was made a contract was written by another bureau, signed in duplicate by an officer thereof, and transmitted to claimant’s decedent, who also signed it and presumably kept a copy thereof in his possession. If the clause to which he objected, which we are now asked to eliminate, was of such grave importance as to be the subject of “• strenuous objections ” on his part when negotiating with the Bureau of Equipment, it was but the dictate of common prudence for him to read and, if necessary,, to object to the presence of said clause when the contract was sent to him for execution. In the Snell case a valid agreement was made between the respective agents of the parties, while in this case no legal agreement was made or could be made until the contract was written and signed, Clark v. United States, swpm, and what preceded the writing and signing were mere negotiations looking to the consummation'of a contract. Monroe case, 184 U. S., 524, and other cases, supra. *657 We think, therefore, that the case before ns is more anologous to Graves v. Boston Ins. Co., 2 Cranch, 419, than .to the Snell case, which refers approvingly to the former. In that case it appeared that the complainant sought relief from the effect of a written policy where, by mistake, the name of Graves was inserted in the policy, whereas the names of Graves & Barnewall, the complainants, were intended to be inserted. The court, in an opinion by the Chief Justice, denied relief, saying, “ The policy was in the possession of the agent of the plaintiff and ought to have been understood by him before it was executed. He retained it for several months before a mistake was alleged. And this feature appearing in the Graves case is referred to in the Snell case as follows: “Hence in Graves v. Ins. Co., 2 Cranch, 419, this court declined to grant relief against an alleged mistake in the execution of a policy, partly because the plaintiff’s agent had possession of the policy long enough to ascertain its contents and retained it several months before alleging any mistake in its reduction to writing.”
Another case which will emphasize what we have said relative to the Snell case is that of Hearne v. Ins. Co., 20 Wall., 488, where a letter was written asking for. insurance on a certain voyage, the company’s reply somewhat varied the terms of the proposal, and a policy was made out on the same day which described the voyage in the terms of the company’s reply. Thereafter it was delivered to the assured and received without objection. The court refused to reform the instrument, saying: “The correspondence between the parties constituted a preliminary agreement. The answer to Hearne’s proposal was plain and explicit. It admitted of but one construction. He was bound carefully to read it, and it is to be presumed he did so. In that event there was as little room for misapprehension on his part as on the part of the company * * *. The inference of full and correct knowledge is inevitable.” If the written instrument which was transmitted to claimant’s decedent be treated as the proposal of a contract by the Bureau of Supplies and Accounts, his signing and keeping a copy of it without complaint for several months produces an analogy to the last *658 case mentioned which is apparent. See also Williams v. Hamilton, 104 Iowa, 423, 34 Cyc., 949. He was not authorized to rely upon the Government official with whom he negotiated to reduce the contract to writing. St. Louis Hay & Grain Co. case, supra. He was under a duty to himself to see that the contract correctly expressed his intentions, and as the statute so exactingly requires contracts to be in writing and signed by the contracting parties, he may have been under a legal duty to examine the contract; but whether he was under a legal duty or not, he ought to bear the consequences of his own neglect. St. Louis Hay Co. case, 37 C. Cls., 281; 191 U. S., 159.
But the claimant further insists that the doctrine of reformation is a “ broad, equitable doctrine ” which “ should be treated from a broad, equitable standpoint.” The power to reform an instrument is broad in the sense of being an extraordinary power which, like that of cancellation, ought- not to be exercised except in a clear case. Atlantic Delaine Co. v. James, 94 U. S., 207. It grants the relief, upon well-defined principles, when a mutual mistake is shown, according to the rules of evidence which it adopts. It does not encourage mistakes by making it easy to correct them, and it admonishes all to use, at the least, ordinary care to ascertain the contents of the contracts which they sign. St. Louis Hay & Grain Co. case, supra. It follows that we can not reform the instrument referred to, and must deny the relief prayed.
The petition as to that portion seeking reformation is dismissed; and we proceed to consider the questions presented under the contract without reformation.
The delivery in this case was to be “ alongside ” the wharf or alongside the lighter. In Turnbull v. Citizens’ Bank 16 Fed., 145, the contract was that the consignees should take the iron “ from alongside,” and it was held “ that undoubtedly and plainly means that they were to take it from where the ordinary appliances of the ship would leave it in discharging — ‘ at the end of the ship’s tackle ’• — on the wharf, if the ship was discharging at a wharf; on a lighter, if the ship could not reach a wharf and was discharging in a stream.” And in Seagar v. N. Y. & C. Mail S. S. Co., 55 *659 Fed., 324; S. C., 55 Fed., 880. “The object of the provision for ‘ delivery alongside and within reach of the ship’s tackles ’ is to secure a certain convenience to the ship by not requiring her to carry the goods for deposit beyond a certain easily determinable limit of space.”
And the general rule is that the delivery of goods at the port of destination is governed by the usages of trade and that a custom at a port of delivery may become part of the contract. Richardson v. Goddard, 23 How., 28; Blossom v. Smith, 3 Blatchf., 316; Higgins v. U. S. Mail S. S. Co., 3 Blatchf., 282.
But this general rule does not obtain where there is an express contract between the parties regulating delivery or defining the rights and liabilities of the parties.
Evidence of usage is “admissible in certain cases for the purpose of annexing incidents to the contract in matters upon which the contract is silent, but it is never admitted to make a contract or to add a new element to the terms of a contract previously made by the parties.” The Delaware, 14 Wall., 579, 603.
When the language of the contract is ambiguous, parol evidence of usage is generally admissible to enable the court to arrive at the real intention of the parties, but it is not admissible to vary, contradict, or defeat express stipulations or provisions restricting or enlarging the customary right. Hart v. Shaw, 1 Cliff., 358, 366; The Gazelle, 128 U. S., 474, 486.
The delivery of the cargoes according to the terms of the contract before us were to be “ alongside ” the wharf or alongside a lighter, and there is no question raised that the cargoes were delivered in good condition at the place mentioned while yet in the vessels; but the defendants urge that the delivery was not completed by bringing the vessel containing the cargo alongside a lighter or the wharf, and that there was a duty on the carrier to complete delivery by bringing the coal to “ the rail of the ship.” The claimant, on the other hand, insists that there was no further duty in the matter of delivery imposed by the contract than to bring the cargo alongside the lighter or wharf and that the discharge of the cargo is regulated by other and express terms of the *660 contract. If the written agreement between the parties defines their rights and liabilities in the matter of discharging the coal, it should have a controlling effect, and if it be silent we would be disposed to hold that the custom or usage at the port of destination could be looked to in ascertaining the intention of the parties. Authorities supra. Delivery where the contract is otherwise silent may involve discharge, at least to an extent, but the term “ discharge ” imports unloading and not delivery. In the case of The Kimball, 3 Wall., 37, the charter party contained a clause that the cargo should “ be received and delivered within reach of the ship’s tackles at the ports of lading and discharging.” The place where delivery was to be had was the wharf at which the ship might be lying. The court says: “ The discharge mentioned does not import a delivery of the cargo; it only imports its unloading from the ship. Such is the obvious meaning of the term and so it has been judicially held,” citing Certain Logs of Mahogany, 2 Sumner, 589. This last-named case is referred to and followed in Sears v. Bags of Linseed, 1 Cliff., 68, and the court there says: “These considerations lead necessarily to the conclusion that the word ‘ discharged ’ as used in the charter party referred to the unlading of the goods after the arrival of the vessel and not to the delivery of the consignment to the consignee.” In Kilroy v. Del. & Hudson Canal Co., 121 N. Y., 22, the bill of lading specified that the coal was to be delivered “ alongside,” and it was held that the delivery “ alongside ” imposed upon the consignee the duty and expense of unloading the coal, under a prevalent custom, and it will be noted that the provision in the Turnbull case, supra, was for a taking “ from alongside,” which was held to mean that it should be taken from where the ship’s tackle would place the cargo.
As stated, the contract here refers to delivery and to discharge — as to delivery in paragraph 8, where it is provided that each cargo is to be delivered alongside a wharf or alongside a lighter (where the carrier can safely lie afloat) “ as ■may be directed by the commandant.” But delivery and discharge are not equivalent terms. The one refers to the accomplishment of the contract of carriage, a point where its duty of carriage ends; the other refers to the removal of the *661 cargo after it has reached the place of delivery. Under the contract the contractor’s obligation of carriage continues until the cargo is safely delivered alongside the wharf or lighter, and when so safely delivered the vessel becomes subject to the commandant’s orders in the matter of discharge.
As to discharging the coal, it is provided in paragraph 5, “the Government discharges cargo at its expense”; paragraph 7 regulates the rate of discharge as well as time of beginning of lay days; paragraph 10 speaks of discharge; and paragraph 13 stipulates that the “ commandant will be instructed to discharge as expeditiously as practicable,” while paragraph 4 requires the ship to report to the commandant upon its arrival at Cavite “ and be subject to his orders in the matter of discharge.”
In the construction of a contract and of different terms in it the court should look to the entire contract and not merely at detached portions to ascertain its meaning and the intention of the parties. Boardman v. Lessees, 6 Pet., 328; Bailey v. Railroad, 17 Wall., 96; 9 Cyc., 579.
It is true that words of doubtful meaning and sometimes ambiguous terms in a contract are open to explanation by parol evidence. The custom or usage of trade is “ often employed to explain words or phrases in a contract of doubtful signification or which may be understood in different senses according to the subject matter to which they are applied. But if it be inconsistent with the contract or expressly, or by necessary implication, contradicts it, it can not be received in evidence to affect it.” Barnard v. Kellogg, 10 Wall., 383.
“ The effect of usage upon the contracts of parties has been decided many times. It may be resorted to in order to make definite what is uncertain, clear up what is doubtful, or annex incidents, but not to vary or contradict the terms of a contract.” Moore’s case, 196 U. S., 157.
Discharging the coal means unloading it, but defendants insist (and it may be conceded that it is proven that the custom or usage at said port was for the ship in discharging to deliver the coal at the rail of the ship or where its tackles would reach) that the discharge was to be by the joint act of the parties and that the terms of the contract should be *662 construed with reference to that custom or usage. If the contract were less definite or silent in that regard the argument would have more force, but it seems to us that the parties have made plain their meaning in the stipulations of the written instrument, and these under the authorities are controlling. In one separate paragraph of the contract it is agreed:
“All expenses of .loading to be borne by the contractors; the Government discharges cargo at its expense.”
Here we find the matter of loading and unloading dealt with in one paragraph, which refers to nothing else, and the relative duties are placed in juxtaposition. It is manifest that the parties were considering this feature and put the result of their negotiations into writing. They could have left the matter of discharging the coal to be regulated by the custom or usage at the port of destination, but they were not bound to do so; and exercising their right in that regard, they expressed their intention in terms. Nor is this conclusion weakened by a consideration of other provisions in the contract, and, as we have pointed out, all the terms must be considered together. It is provided that the ships should be subject to the orders of the commandant “in the matter of discharge” upon their arrival; the Government guaranteed “ discharge ” at the rate of 400 tons per day in the stream and 600 tons per day at the wharf, and further agreed to pay demurrage for detentions “ caused by the Government not discharging” at said rates; and it further stipulated to instruct the commandant “to discharge the cargo as expeditiously as practicable.” The use of the same term in these different parts of the one instrument tends to show that the same meaning was ascribed to it wherever used. To divide the responsibility of unloading, so that one party would lift the coal from the hold and the other would receive it at the rail, could certainly have some effect upon the ability of the Government to carry out its guaranty as to the rate of discharge as well as upon the ability of the commandant to increase that rate of discharge, for in that event the rate of discharge could be fixed by the amount of coal presented at the rail by the agents of the contractors which might be more or less than the guaranteed rate, and to *663 obviate this condition we should have to import into the contract a provision that said guaranties were made, provided the amounts to 400 tons and 600 tons, respectively, were presented by the contractors at the rail. But if this view is doubtful and it can yet be said that the custom or usage may affent the terms referred to, there still remains the explicit provision above quoted from paragraph 5 of the contract.
The expense incident to taking the coal from the end of the ship’s tackle would be borne in any event by the Government, even though the custom or usage were held to prevail under the provisions referred to and excluding paragraph 5, and in that view that paragraph would have no field of operation. But it is our duty to construe the entire contract without excluding any of its terms, if possible to do so, and with reference to all and every of its provisions. (Authorities supra.)
These considerations lead us to the conclusion on this phase of the case that the defendants were, bound to bear the expense of discharging the coal, and that it could have been unloaded by the use of the ship’s appliances and material with the latter’s consent or by independent means adopted by the Government. As the former course was pursued, we think the claimant is entitled to be paid the reasonable value of the materials used and the reasonable value of the use of its appliances and services of its crew.
As to demurrage: The contention between the parties as to demurrage arises from the fact that the auditor allowed the claimant demurrage based upon the idea that the ships were to be taken to the wharf, or discharged in the stream, at 600 tons per day when they had lightened to 20 feet, and until so lightened the contract rate of 400 tons in the stream should prevail.
The guaranty of the Government was “but 20 feet of water at the coaling wharf, Langley Point,” and the claimant calling attention to the seventh paragraph that the discharge should be “ at the rate of 400 tons per day for such part of cargo as may be necessary to discharge in the bay to enable a vessel of deep draft to go to the wharf and 600 tons per day at the wharf,” and also to paragraph 13, guar *664 anteeing an average daily discharge of 400 tons in the stream and 600 tons at the wharf, and stipulating that the commandant would be instructed “to discharge as expeditiously as practicable, with a view of exceeding those rates,” argues, hence, that the intent and meaning of the contract is that the ship would be taken to the wharf for discharge as soon as she was lightened sufficiently to “ enable a vessel of deep draft to go to the wharf,” and, therefore, that the 20-foot depth guaranteed was not the limit of depth intended if in fact there was a greater depth. The difference in discharging at one or the other rate, in the stream or at the wharf, is apparent, because the ship would save a day in three if the rate was 600 instead of 400 tons.
The defendants insist that as the Government guaranteed 20 feet of water the commandant was not required to take any account of the depth until the ship was lightened to the 20-foot draft; and they insist that when “the Government guarantees but 20 feet of water ” that determines the question as to when the change in the rate of discharge would be operative. As pointed out above in this opinion, every part of the contract must be looked to and given, if possible, some meaning. But in the view we take it is unnecessary to determine this question, because if it were conceded that claimant’s contention as to the meaning of the contract is correct there would yet be a fatal objection to applying it. The burden of proving that there was a greater depth is upon the claimant, as he predicates a claim upon the allegation that a large part of the coal should have been discharged at the rate of 600 tons when it was discharged at 400 tons per day. The proof relied on is the statement that the Croydon, “ although drawing 22 feet 6 inches, was taken to the plant to facilitate her discharge,” and claimant insists that as one vessel was taken to the plant when drawing 22 feet 6 inches, therefore other vessels should have been taken to the wharf when lightened to that ¡Iraft. We may add in this connection that claimant insists that another vessel, the Selsdon, was taken to the wharf drawing approximately 21 feet 6 inches. The Croydon was taken to the wharf and the work of unloading her was begun June 22, and the Selsdon was discharged June 24.
*665 The period, during which the eight vessels were at said port and discharging ranged from May 23, when the first of them arrived at Cavite (the Knight of St. George), and September 28, when the Needles arrived there. Seven of the vessels, however, arrived or were discharged in the months of May, June, and July. The Oroydon was discharged on July 8, but it does not definitely appear on what day she was taken to “ the plant.”
The question, then, is presented as to whether the evidence is sufficient to show that there was as to the other vessels which were not taken' to the wharf 22 feet 6 inches of water or, to state it broader, whether the evidence is sufficient to justify a conclusion that there was more than 20 feet of water. As stated, the claimant has the burden of proving this fact. There is a presumption, which is frequently indulged, that where a condition or status of a continuous nature is shown to exist at a definite time it may be inferred to exist at a subsequent time. 16 Cyc., 1052. But the inference thus drawn presupposes that the fact relied upon is one that has the quality of being continuous. 1 Greenl. Ev., sec. 41. In the case before us we are asked to apply the rule to the depth of water at a wharf. No proof is made of the tide, its ebb or flow or variableness. We know that the depth at a wharf may be affected by tide. We are not informed of the tidal condition when either of said vessels went to the wharf, and diligent counsel has not informed us, nor have we been able to find, where any court has applied the presumption mentioned to a condition as variable as the tides. The actual condition was as susceptible of ascertainment by the ship’s agents as by the Government agents. And as the proof is not made, except as sta'ted, we do no feel authorized to find that the requisite fact is shown by the evidence, and therefore we should decline to disturb the conclusions of the auditor in the question of the depth upon which the rate of discharge should be based.
3. Another item of demurrage is based upon the contention that a donkey engine, belonging to the Knight of St. George and being used by defendants in discharging that ship’s cargo, blew out, entailing a delay of 19-¡- hours, and *666 demurrage is claimed for this detention. The argument is that as the defendants could have used other means than the ship’s appliances in discharging, they should, upon the breaking down of the engine, have secured other means, and failure to continue prompt discharge was a fault of defendants for which they should pay. We do not assent to this contention. Under the views above stated the defendants were bound to discharge at their expense and were free to use, certainly with the consent of the ship’s agents, its appliances, paying therefor reasonable compensation. As we view the situation the use of the engine was a bailment for the mutual benefit of the parties, the one to get the use and the other compensation, and in such case the owner and bailor impliedly represents that the property to be used by the bailee is reasonably suited to the contemplated use. Bass v. Cantor, 123 Ind., 444. If it break down when it is being properly used, the bailee is not chargeable with fault, but the bailor may be chargeable. 5 Cyc., 179. There is nothing to show any improper use of the engine by defendants’ agents, and it is therefore inferable that it broke from inherent defects, and as a consequence defendants are not responsible for it nor for the delay caused thereby.
4. The claimant seeks to recover back the port charges levied by the customs authorities of the Philippine Islands for which he says he was not liable under the terms of his contract with the Government. Each of the vessels was required to pay tonnage dues and other similar charges. The claim of exemption from these is based upon the act of March 3, 1905, 33 Stat. L., 928, which provides tonnage dues at ports in said islands and declares:
“ Sec. 15. That the following shall be exempt from tonnage dues: A vessel belonging to or employed in the service of the Government of the United States.”
It is insisted by claimant that these vessels were “employed in the service ” of the United States.
The contractor, claimant here, secured the vessels to transport the coal which he agreed to deliver at Manila Bay for the Government. Each ship was to be consigned to the contractor at the port designated by the Bureau of Equipment. When loaded it should sail immediately and directly for *667 Cavite, and on arrival there report to the commandant. Each cargo was to be delivered alongside a wharf or alongside a lighter, and the vessels could go either by way of Cape of Good Hope or the Suez Canal, “ at the option of the owners.” Each was maimed by master and crew in the employ of the owner, and the United States exercised no control over them. We think the contract was one of affreightment. Shaw v. United States, 93 U. S., 235. Where the general owner retains the possession, command, and navigation of the vessel and contracts to carry a cargo of freight for the voyage the charter party is a contract of affreightment, sounding in covenant. “By such a contract the charterer obtains no right of control over the vessel.” Richardson v. Windsor, 3 Cliff., 395, 399. The section quoted refers to and is inclusive of vessels (1) belonging to or (2) employed in the service of the Government. In either case there is to be inferred an absolute control of the vessel by the Government, and the fact that it carries a cargo of freight under contract with the United States does not put the vessel in the service of the Government.
We are referred to two cases relied on to sustain the contention of claimant upon this question, (1) the Swift & Co. case, 43 C. Cls., 409, where the contractor was exempted from the payment of duties on meat taken into Cuba for the subsistence of the Army. The meat was to be transported in Government transports which were, of course, in the service of the Government, and, the supply of contract beef for the Army’s use having failed, the contractor furnished meat from the stock of beef on hand which he had previously shipped for sale to the citizens of Santiago and upon which duty had been paid. When that beef was furnished, accepted, and used to supply the Army, under the terms of the contract, the court held that the contractor was entitled to be repaid the duties he had paid upon it, because by the-terms of the contract the beef to be furnished was exempted from duties. That case has no application here. (2) The Morris case, 14 Pet., 464, also relied on, involved the construction of an act making it unlawful for a citizen of the United States to serve on board any vessel of the United States “employed, or made use of, in the transportation” *668 of slaves, and it was held that under the facts of that case the vessel was “ employed ” in the slave trade, though it was bound on its outward voyage and was not, at the time, transporting slaves. “ To be ‘ employed,’ in anything,” says the court, “ means not only the act of doing it, but also to be engaged to do it.” But the act before us does not involve the question of whether the ships exempted from tonnage duties are employed by the United States, for to come within the exemption they must either belong to or be employed in the service of the United States. “ In the service ” here does not mean “ serving,” because a vessel may be in the service and be not doing any service, as was clearly pointed out by Chief Justice Nott in the Aulick case, 27 C. Cls., 109, where he says: “ There is a distinction between rendering service and being in service * * *. A ship of war may pass her entire life in a condition of readiness to serve, but of never serving.” In other words, she is in the service though not rendering service. And so a retired Army officer may still be in the service. 105 U. S., 244. As the act includes the vessels belonging to as well as those in the service of the Government, it is evident that its application is not based on ownership of the vessel merely but on control as well. And we can not see how a vessel can be “in the service of the Government” when the Government has no control of the vessel itself or its management. Besides this, it would appear incongruous to hold that the Government should pay for the use of the machinery and appliances of a ship, as we have held in this case, or to hold that it should pay demur-rage, as we are asked to do here, if the ship were “in the service of the Government.” Our conclusion is that the vessels in question are not brought within the terms of section 15 of the said act.
Part of the petition having been dismissed as to the re-for.mation of the contract, judgment is now ordered entered in favor of the claimant in the sum of $1,607.57 on Findings V and VII.